930 P.2d 518

**STATE of Arizona, Appellee,**

v.

**Max A. DUNLAP, Appellant.**

**No. 1 CA–CR 94–0068.**

Court of Appeals of Arizona, Division 1, Department B.

Sept. 5, 1996.

Review Denied Jan. 14, 1997.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and Warren J. Granville, Carolyn K. Passamonte, Assistant Attorneys General, Phoenix, for Appellee.

Margaret O'Donnell, and McNally & Robinson by Kevin McNally and Gail Robinson, Frankfort, KY, for Appellant.

## OPINION

VOSS, Judge.

Max A. Dunlap (defendant) appeals his convictions for first degree murder and conspiracy to commit obstructing a criminal investigation or prosecution, influencing a witness, and receiving a bribe by a witness. We affirm.

## PROCEDURAL HISTORY

This case arises out of the car bombing murder of investigative reporter Don Bolles on June 2, 1976. Bolles' admitted murderer was John Harvey Adamson. Adamson claimed that defendant hired him to commit the murder and that former co-defendant, James Robison, assisted him.

In 1977, Adamson entered into a plea agreement with the state in which he pled guilty to second degree murder. The agreement contained a stipulation that Adamson would receive a forty-eight to forty-nine-year sentence with a total incarceration time of twenty years and two months. In exchange, Adamson agreed to and did testify against Dunlap and Robison at their joint trials for first degree murder and conspiracy. Both Dunlap and Robison were convicted and sentenced to death on the murder charge. The Arizona Supreme Court reversed their convictions and remanded for new trials. *State v. Dunlap*, 125 Ariz. 104, 608 P.2d 41 (1980); *State v. Robison*, 125 Ariz. 107, 608 P.2d 44 (1980).

Adamson refused to testify in the retrials of Dunlap and Robison and attempted to exact a more favorable plea agreement. The state refused to negotiate with Adamson, treated Adamson's refusal to testify as a breach of the 1977 plea agreement, and reinstated first degree murder charges against him. Adamson unsuccessfully sought relief from the state's action in the Arizona Supreme Court. *Adamson v. Superior Court*, 125 Ariz. 579, 611 P.2d 932 (1980).

After the Arizona Supreme Court ruled against him, Adamson offered to testify at the retrials of Dunlap and Robison, but the state declined the offer. Adamson unsuccessfully sought habeas corpus relief in federal court from the supreme court ruling. *Adamson v. Hill*, 667 F.2d 1030 (9th Cir. 1981), *cert. denied*, 455 U.S. 992, 102 S.Ct. 1619, 71 L.Ed.2d 853 (1982). Adamson was convicted of first degree murder and sentenced to death, and the Arizona Supreme Court affirmed his conviction. *State v.*

*Adamson,* 136 Ariz. 250, 665 P.2d 972, *cert. denied,* 464 U.S. 865, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983).

Adamson spent the next several years in federal court attacking his conviction and death sentence, and eventually succeeded in having his death sentence overturned. *See generally Adamson v. Ricketts,* 758 F.2d 441 (9th Cir.1985); *Adamson v. Ricketts,* 789 F.2d 722 (9th Cir.1986) (en banc), *rev'd,* 483 U.S. 1, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987); *Adamson v. Ricketts,* 865 F.2d 1011 (9th Cir.1988) (en banc), *cert. denied,* 497 U.S. 1031, 110 S.Ct. 3287, 111 L.Ed.2d 795 (1990); *Adamson v. Lewis,* 955 F.2d 614 (9th Cir.), *cert. denied,* 505 U.S. 1213, 112 S.Ct. 3015, 120 L.Ed.2d 888 (1992). In 1991, during the pendency of the last appeal, the state and Adamson entered into a stipulation and cooperation agreement that essentially reinstated the 1977 plea agreement requiring Adamson to testify against Dunlap and Robison.

In the meantime, the charges against Dunlap were dismissed without prejudice on June 2, 1980. Dunlap unsuccessfully sought an immediate retrial. *Dunlap v. Corbin,* 532 F.Supp. 183 (D.Ariz.1981), *aff'd,* 673 F.2d 1337 (9th Cir.1982). On December 19, 1990, the state filed a criminal complaint against defendant and Robison for first degree murder and conspiracy to commit obstructing a criminal investigation or prosecution, influencing a witness, and receiving a bribe by a witness. On July 2, 1991, the state filed an information against them on the same charges. The cases were later severed. Defendant was convicted by a jury of both charges. He received a life sentence on the murder charge and a two-year concurrent sentence on the conspiracy to obstruct investigation and prosecution charge.

## FACTS

Adamson was immediately linked to the Bolles murder. On the pretext of providing newsworthy information to Bolles, Adamson arranged to meet Bolles on June 2, 1976, at a hotel in Phoenix to carry out the car bombing. Bolles survived the explosion and uttered the words "John Adamson" and "Adamson sent me" to onlookers. Bolles died on June 13, 1976.

Adamson was the state's key witness at trial. A career criminal, he testified he met defendant in 1974 through attorney Neal Roberts and had four or five business dealings with defendant prior to the Bolles murder. He testified that in March of 1976, Adamson, defendant, and others were present at a meeting in Roberts' office. After the meeting, defendant approached Adamson and asked him how much it would cost to have two individuals killed.

Defendant explained that his long-time friend and benefactor, Kemper Marley, wanted then Attorney General Bruce Babbitt and a former employee, Al Lizanetz dead. Marley was a prominent business and political leader who owned a liquor wholesale distributing company. He had been nominated for a vacancy on the state Racing Commission by then Governor Raul Castro. The stated reason Marley wanted these individuals murdered was because Babbitt planned to initiate an investigation into price-fixing in the liquor industry, and Lizanetz had embarrassed Marley over the years by making public accusations against him.

Two weeks later, defendant contacted Adamson and asked him how much it would cost to have Babbitt, Lizanetz, and Don Bolles killed. Defendant said Bolles had given Marley a "bad time" about Marley's nomination to the Racing Commission and "was going to start on something soon." He said Bolles had to go first. Adamson told defendant it would cost $50,000 to kill the three individuals and that he needed $5000 as a down payment. Adamson said defendant gave him $2000 at that meeting.

Adamson had known James Robison for four years and had worked with him on other bombings in connection with insurance scams. Adamson asked Robison to assist him with the three murders and promised to split the money with him. Adamson testified in detail about designing and constructing the explosive device with Robison and their plan to carry out the bombing.

Adamson met with defendant several times prior to the bombing. Defendant told him he would pay Adamson the remainder owed him after the bombing. Adamson told defendant

he previously made arrangements for defendant to leave the money in a package at attorney Tom Foster's office.

According to Adamson, he planted the bomb and went to a local bar while Robison detonated it. After the explosion, Robison called Adamson. When Adamson asked if it was done, Robison said, "[E]yeball to eyeball ... send Mr. Smith to the bank." Adamson testified "Mr. Smith" was a coded expression for "Mr. Dunlap."

Adamson went to Tom Foster's office several times to get the package from defendant. On June 10, 1976, Adamson met defendant there and received an envelope containing almost $6000, mostly in small bills. Adamson was arrested shortly thereafter.

The state also presented evidence to support the conspiracy to obstruct charge. Bette Gleason, Robison's self-described common-law wife, testified that from the spring of 1977 through the fall of 1979, she received $1500 for a new truck and around $500 per month in cash. She obtained the money from Robison's attorney, David Derickson, who in turn received it from defendant's attorney, John Savoy. Savoy was collecting money for defendant's legal defense fund and diverted some of those funds to Bette Gleason.

In addition, the state presented evidence of other gifts and money sent to Robison directly from defendant or indirectly through third parties. The state claimed these gifts were given to keep Robison quiet and because defendant was grateful Robison had not testified against him. The state also claimed defendant burned and shredded documents to cover up his involvement in the murder.

Defendant maintained his innocence and alleged that Adamson framed him. The apparent reason for this frame-up was to avert retaliation by defendant after Adamson defrauded defendant in a business deal. Defendant admitted he delivered money to Tom Foster's office. However, he claimed a stranger came to his house on the morning of June 10, 1976, carrying a brown paper bag containing money. The stranger, who said Neal Roberts wanted a favor from him, told defendant to change the money into smaller bills and deliver it to Tom Foster's office that day.

Defendant advanced an alternative theory for the bombing. According to him, at the time of his death, Bolles was investigating dog track owners, Emprise Corporation, and the Bradley Funk family. Bolles had testified before a congressional committee that was investigating Emprise, the Funks, and their tie to organized crime. Defendant suggested that Adamson, who sometimes worked at the race track, was connected to Bradley Funk and carried out the murder for Emprise and the Funks.

Defendant also claimed the investigation was misdirected and mishandled. Defendant presented evidence of unauthorized purging by the police department of the "76–86" file (the police department file on the Bolles bombing), file 851 (the Emprise file), the Organized Crime Bureau file, and certain surveillance records. In defense of the conspiracy to obstruct charge, defendant claimed he and Robison became acquainted after they were both convicted and sentenced to death, and that he gave gifts and money to Robison out of friendship. Defendant raises several issues on appeal.

## DISCUSSION

A. *Were There Due Process Violations Requiring Dismissal of the Indictment Because of Pre-indictment Delay or Because the Police Lost or Destroyed Evidence?*

1. *Pre-indictment Delay*

 Defendant first alleges that the ten-year delay from the time the first degree murder charge was dismissed without prejudice in 1980 until it was refiled in 1990 violated both the speedy trial provisions of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. We reject this argument.

 If a defendant is not under arrest and no indictment or charge is outstanding, the speedy trial provisions of the Sixth Amendment do not apply. *United States v. Marion*, 404 U.S. 307, 313–15, 92 S.Ct. 455,

459–61, 30 L.Ed.2d 468 (1971); *State v. Williams*, 183 Ariz. 368, 379, 904 P.2d 437, 448 (1995). Similarly, the Sixth Amendment is not implicated if the government dismisses charges in good faith and later refiles them, as long as a defendant has not been subjected to actual restraints on his liberty after dismissal. *United States v. Loud Hawk*, 474 U.S. 302, 310–11, 106 S.Ct. 648, 653–54, 88 L.Ed.2d 640 (1986); *United States v. Mac-Donald*, 456 U.S. 1, 6–8, 102 S.Ct. 1497, 1500–02, 71 L.Ed.2d 696 (1982). The case of *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), relied on by defendant, is distinguishable because there, under an unusual North Carolina procedural device known as the *"nolle prosequi* with leave," the prosecution was halted, the defendant was released from custody, but the indictment was never dismissed.

■ Prior to arrest and official accusation, statutes of limitation provide the "primary guarantee against bringing overly stale criminal charges." *United States v. Ewell*, 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966). The crime of first degree murder has no statute of limitation. Ariz.Rev. Stat. Ann. § (A.R.S. § ) 13–107(A) (formerly A.R.S. § 13–106(A)). However, such statutes "do[ ] not fully define [defendant's] rights with respect to the events occurring prior to the indictment." *Marion*, 404 U.S. at 324, 92 S.Ct. at 465. "[T]he Due Process Clause has a limited role to play in protecting against oppressive delay." *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977).

■ For pre-indictment delay to violate due process, a defendant must show that (1) the delay was intended to gain a tactical advantage or to harass him, and (2) the delay actually and substantially prejudiced him. *Williams*, 183 Ariz. at 379, 904 P.2d at 448. The Supreme Court in *Lovasco* stated that "proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." 431 U.S. at 790, 97 S.Ct. at 2048–49. "Under the two-pronged test of *Lovasco*, as interpreted by the lower courts, it will be extremely difficult

for a defendant to prevail on his due process claim." Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 18.5, at 428 (1984).

### a. *Reason for Delay*

Defendant claims the state had no legitimate reason for the delay in refiling murder charges against him because Adamson expressed his willingness to testify in the retrials of defendant and Robison in 1980. Defendant claims the delay was an intentional attempt to gain a tactical advantage over him. We disagree.

After Adamson breached his 1977 plea agreement, the state had a right to prosecute him on the original first degree murder charge. This prosecution occasioned an extended appellate process. Regardless whether the state's actions in this appellate process were unfair in some sense to defendant, there is no evidence the delay was intended to gain a tactical advantage over defendant or to harass him. *State v. Hall*, 129 Ariz. 589, 593, 633 P.2d 398, 402 (1981). The state also continued to investigate other possible theories and suspects, and to develop its case in connection with the conspiracy to obstruct charge. Defendant has not shown that the state delayed to gain a tactical advantage over him. *See Lovasco*, 431 U.S. at 792–93, 97 S.Ct. at 2049–50.

### b. *Prejudice*

■ "[A] defendant has a heavy burden to prove that pre-indictment delay caused actual prejudice; the proof must be definite and not speculative." *State v. Broughton*, 156 Ariz. 394, 397–98, 752 P.2d 483, 486–87 (1988). To make a showing of actual and substantial prejudice, "it is not enough to show the mere passage of time nor to offer some suggestion of speculative harm; rather the defendant must present concrete evidence showing material harm." *United States v. Anagnostou*, 974 F.2d 939, 942 (7th Cir.1992), *cert. denied*, 507 U.S. 1050, 113 S.Ct. 1943, 123 L.Ed.2d 649 (1993). The length of the delay is not determinative of whether there has been a due process violation. *Pharm v. Hatcher*, 984 F.2d 783, 785–86 (7th Cir.), *cert. denied*, 510 U.S. 841, 114

S.Ct. 125, 126 L.Ed.2d 89 (1993) (no due process violation in thirteen-year delay between crime and trial); *Wilson v. McCaughtry*, 994 F.2d 1228, 1234 (7th Cir.1993) (no due process violation in sixteen-year delay between crime and indictment); *Stoner v. Graddick*, 751 F.2d 1535, 1543 (11th Cir.1985) (no due process violation for nineteen-year delay between crime and filing charges); *Story v. State*, 721 P.2d 1020, 1028–29 (Wyo.), cert. denied, 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 405 (1986) (no due process violation in charging defendant with crimes committed seventeen years earlier).

■ Defendant first contends he was prejudiced because material witnesses had died. However, the death of a witness alone is insufficient to establish prejudice; it must be shown that the witness would have testified, the jury would have found the witness credible, and the testimony of the witness would have affected the outcome of the trial. *United States v. Doerr*, 886 F.2d 944, 964 (7th Cir.1989). In particular, defendant claims the death of Robert Sprouse deprived him of vital testimony. Sprouse had mafia connections and allegedly had information from these sources that Neal Roberts arranged the Bolles murder and set up Marley and defendant to take the blame. Sprouse was incarcerated in a Missouri prison and committed suicide in 1989.

Defendant failed to make an adequate showing of prejudice. First, whether Sprouse's testimony as to what others told him would be admissible under the rules of evidence is unclear. Second, Sprouse's credibility would be subject to serious impeachment because of his criminal background, and third, there is no reasonable basis to assume the jury's verdicts would have been different with his testimony.

Defendant also alleges that the deaths of Bradley Funk and Kemper Marley prejudiced his defense. However, he has not shown that either person would have testified at trial and he has not revealed what their testimony would have been. Although prior testimony of other deceased witnesses was read during the trial, defendant has failed to show actual, substantial prejudice due to Funk's and Marley's unavailability to testify which would constitute a due process violation.

■ Defendant next claims that he was prejudiced because some witnesses were unable to recall with specificity the events occurring many years earlier. However, "diminished recollection by witnesses does not, by itself, constitute the type of substantial prejudice warranting a finding of a due process violation." *Broughton*, 156 Ariz. at 398, 752 P.2d at 487 (citations omitted). Defendant's argument that the witnesses' memory loss prejudiced his case is purely speculative. Finally, as discussed below, defendant's claim that lost or destroyed documents may have contained exculpatory evidence and their absence substantially prejudiced his case is also based on conjecture. Defendant has not shown that pre-indictment delay violated his due process rights requiring dismissal of the indictment.

## 2. *Lost or Destroyed Evidence*

■ Defendant claims that his due process rights were violated because the police lost or destroyed documents from certain police files. A former Phoenix police officer testified he was ordered by his superiors to remove all information from the Emprise file relating to the Funk family and Adamson. He removed approximately six pieces of paper. He was then told to renumber and recopy the pages and place them in sequence. He did so to make it appear as though nothing were missing from the file.

The officer recalled that one page listed the names of people attending a Racing Commission meeting, one page contained a list of people in dog racing with criminal backgrounds, and the other pages concerned attempts by Emprise to obtain a liquor license in Arizona. He thought one page may have contained a reference to Adamson and his connection with dog racing. However, another officer who took possession of the documents removed from the Emprise file did not recall any references to Adamson in them.[1]

---

1. Although there were allegations that one of the

items removed from the Emprise file was a photo

The stated purpose of this purging was to remove non-public records from the files and to safeguard the intelligence process. These documents were never relocated.

Index cards relating to John Adamson, Mary Adamson, and Kemper Marley were removed from the Organized Crime Bureau indexing file and were kept in an officer's desk until he left the department. He told another officer to retain the cards until the Bolles investigation was completed. This procedure was intended to prevent access to information in the Organized Crime Bureau files relating to those individuals.

The police department conducted an internal affairs investigation after the files were purged. The procedure used in removing documents from the Emprise file and index cards from the Organized Crime Bureau file was admittedly improper and unauthorized. After the investigation, some questions remained unanswered. However, the police officers involved in the purging process testified that they did not intend to frame anyone or to protect others from being investigated.

The 76–86 file that related to the Bolles murder had no connection to the Emprise File. The officer who maintained the 76–86 file never noticed that anything was missing or had been removed. However, he testified that in 1979 the file was four inches thick, but at the time of trial, it was only three-quarters of an inch thick. An officer testified that surveillance worksheets on the Bolles investigation were destroyed, although the surveillance reports, which summarized the worksheets, had been kept. Defendant claims that, because the police improperly removed, lost, or destroyed documents from the Emprise file, the Organized Crime Bureau file, the 76–86 file, and destroyed surveillance worksheets, his due process rights under the Fourteenth Amendment and article two, section four of the Arizona Constitution were violated and the indictment must be dismissed. We disagree.

■ The Due Process Clause requires the state to preserve evidence that is of constitutional materiality. Such evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984). The state's duty to preserve is limited to material evidence that "might be expected to play a significant role in the suspect's defense." *Id.* at 488, 104 S.Ct. at 2534.

■ The United States Supreme Court has held that the Due Process Clause requires a different analysis if the state fails to preserve evidence which is not material exculpatory evidence, but which "might have exonerated defendant." *Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58, 109 S.Ct. at 337. Similarly, for purposes of state constitutional due process, our supreme court has held that " '[a] defendant is not deprived of due process by the destruction of evidence unless the state has acted in bad faith or the defendant is prejudiced by the loss.' " *State v. Youngblood,* 173 Ariz. 502, 507, 844 P.2d 1152, 1157 (1993) (quoting *State v. Day,* 148 Ariz. 490, 496, 715 P.2d 743, 749 (1986)). "[I]n the context of a due process analysis, the Supreme Court has made clear that 'bad faith' has less to do with the actor's intent than with the actor's knowledge that the evidence was 'constitutionally material.' " *State v. Walker,* 185 Ariz. 228, 238, 914 P.2d 1320, 1330 (App.1995)(quoting *Arizona v. Youngblood,* 488 U.S. at 57–58, 109 S.Ct. at 337). "The presence or absence of bad faith for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood,* 488 U.S. at 56, 109 S.Ct. at 336 n*.

Here, the specific contents of the lost or destroyed documents are unknown. The documents might have been exculpatory, but their exculpatory value is not apparent.

of Adamson removing a drunk Bradley Funk from an automobile (the "drunk Funk" report), the trial testimony revealed no one actually saw or remembered seeing this photo.

Therefore, defendant cannot show prejudice in fact. Although the police may have engaged in improper conduct that was contrary to standard police procedure, no evidence demonstrates that they acted in bad faith in a constitutional sense. We find no due process violation under either the federal or state constitutions requiring dismissal of the indictment.

## B. Did the Trial Court Fail to Instruct the Jury Adequately Regarding Defendant's Prior Conviction and Sentence?

 Defendant requested a jury instruction indicating that he had previously been convicted of Bolles' murder and sentenced to death, and the Arizona Supreme Court reversed the conviction. The proposed instruction advised the jury that it was "not to consider this in any way, shape or form in your deliberations." The judge refused the instruction because other instructions adequately covered the issue. Defendant claims this refusal was error.

The trial court is not required to give a defendant's proposed instruction when its substance is adequately covered in other instructions. *E.g., State v. Walden,* 183 Ariz. 595, 614, 905 P.2d 974, 993 (1995), *cert. denied,* — U.S. —, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

Here, at the beginning of the trial, the trial court told the jury, "I want you to know that we are starting with a clean slate. As he sits in this courtroom today and henceforth during this trial, Mr. Dunlap is presumed to be innocent." At the close of evidence, the trial court again instructed the jury as to defendant's presumption of innocence and the state's burden of proof.

These instructions adequately covered defendant's presumption of innocence. Additionally, the trial court instructed the jury to disregard irrelevant matters when the jury sent a note asking if a previous conviction of defendant would have been admissible in this trial.

Moreover, we have difficulty concluding that the trial court failed to prevent defendant from being prejudiced by evidence of his prior conviction and sentence. Indeed, defendant relied on his prior conviction and reversal by the supreme court to explain his relationship with Robison. Defendant referred to the trial, conviction, and sentence in his opening statement. He cross-examined attorney David Derickson regarding whether anything indicated defendant knew Robison before the men were incarcerated together. Defendant asked Ken Freedman about defendant paying for another death row inmate's legal representation. He questioned Doris Thrasher about ferrying items to Robison for defendant after defendant was released from prison. Lastly, defendant mentioned during closing argument his prior criminal proceedings, his friendship with Robison that began with their arrests, and his generosity toward another death row inmate.

The trial court did not abuse its discretion in refusing defendant's instruction.

## C. Did the Trial Court Unreasonably Limit Cross–Examination of John Adamson?

During Adamson's cross-examination, counsel sought to introduce a letter dated October 30, 1976, from Adamson to his then wife Mary. Adamson wrote the letter from jail prior to entering into the plea agreement with the state. The letter referred to a plan between Adamson and his private investigator, John Zobel, and to his prospective agreement with the state. The letter (called the "Zobel letter") reads as follows:

> There is [sic] several interesting things which just he [Zobel] and I have planned. Mainly, the defendants of future indictments hire him as investigator with 25% of fees off the top—going to you—which if everything gels should be strong—because of not only his knowledge, but influence with me, if you know what I mean.
>
> The situation with John [Zobel] is actually; my information will in most probability get several people charged with various crimes ranging from murder to arson to fraud to conspiracy. But that in and of itself is not the most important determination of my deal or actions. True, every detail I give them will be checked and double checked in hopes of finding the slightest flaw from which they can conclude the rationalization

**454**

to cancel any and all agreements in my behalf. So obviously everything must be completely true as I know it. But what will ultimately determine any individual's involvement and subsequent guilt or innocence is the jury itself. There is where the variable is housed; whether I will be an excellent believable witness with no mistakes or would the possibility of my making an honest nervous mistake on the stand, interest some of the individuals involved. *John and I feel the latter will be of considerable financial interest to some of the people involved.*

(Emphasis added.) The state objected, and the court excluded the letter as irrelevant.

During redirect examination, in an attempt to rehabilitate Adamson, the state read only those portions of the letter not italicized. The prosecutor asked Adamson what he meant in that letter, and Adamson replied:

Well, what I meant basically was that if I made a deal, that I would have to tell the truth, and I was having a lot of difficulty with the thought of making a deal and testifying against guys that I had known for a long time, and just basically that I was having trouble dealing with it, and that I would have to tell the truth in every detail known to me in the serious cases that were involved, and what I was going to testify if I made a deal.

During recross examination, counsel attempted to read the rest of the letter and to cross-examine Adamson about it. Defendant believed the omitted portions of the letter suggested Adamson had concocted a scheme involving other defendants in order to obtain money for his wife, and also that he might be willing to alter his testimony for a price. The judge ruled that counsel could not do so because it would be improper recross examination. Counsel requested that he be allowed to read the omitted portions later in the trial. The court ruled that this request was untimely under Rule 106, Arizona Rules of Evidence. After defense counsel explained that the prosecutor had "opened the door" and that, in the interest of fairness, he should be permitted to introduce the other parts of the letter, the court stated:

I am suggesting to you, Mr. Miller, if you believe that, then you don't understand Rule 106, because that's not how you do that. If you feel that he is reading a portion of a lie and taking it out of context, your responsibility is, at that point, to ask me pursuant to the rule, to require him to read those other parts that you believe, in fairness, are required, not just sit there and then some later time say, I am going over the rest of it on cross-examination, that is not how it works. That is not consistent with the Rules of Evidence. I mean, I am confident about that.

Defendant argues that the court's ruling was incorrect and he was denied the constitutional right to cross-examine Adamson. Although the trial court erred, reversal is not required.

### 1. *Application of Evidence Rule 106*

 The trial court erred in its interpretation and application of Rule 106, Arizona Rules of Evidence. That rule provides:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Federal Evidence Rule 106 is the source for the Arizona Rule. *State v. Passarelli*, 130 Ariz. 360, 363, 636 P.2d 138, 141 (App.1981). The advisory committee's note to federal rule 106 states:

The rule is an expression of the rule of completeness.... The rule is based on two considerations. The first is the misleading impressions created by taking matters out of context. The second is the inadequacy of repair work when delayed to a point later in the trial.... *The rule does not in any way circumscribe the right of the adversary to develop the matter on cross-examination or as part of his own case.*

Fed.R.Evid. 106 advisory committee's note (emphasis added).

 Under the doctrine of completeness, the excluded portions of a writing may be required to be read, if necessary, to explain

the admitted portion, place the admitted portion in context, avoid misleading the trier-of-fact, and insure a fair and impartial understanding of the writing. *United States v. Soures,* 736 F.2d 87, 91 (3d Cir.1984), *cert. denied,* 469 U.S. 1161, 105 S.Ct. 914, 83 L.Ed.2d 927 (1985); *see also United States v. Sutton,* 801 F.2d 1346 (D.C.Cir.1986).

Contrary to the trial court's expressed view, the rule does not require the adverse party to introduce the excluded portions immediately after introduction of portions of the writing by the first party. *See Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988). In *Rainey,* spouses of deceased Navy pilots brought an action against the aircraft manufacturer and service company. The primary issue at trial was whether the crash was caused by pilot error or faulty equipment. Several months after the accident, the plaintiff, John Rainey, himself a Navy flight instructor, sent a letter to a Navy Lieutenant Morgan. He indicated he believed the most probable cause of the crash was "loss of useful power (rollback) caused by some form of pneumatic sensing/fuel flow malfunction...." *Id.* at 159, 109 S.Ct. at 444.

At trial, Rainey did not testify during the case in chief, but was called by the defense as an adverse witness. He was questioned about certain portions of the letter. However, on cross-examination, when counsel attempted to introduce the remainder of the letter concerning his belief about the cause of the crash, the trial court sustained a defense objection on the ground that the letter called for an opinion. Following a defense verdict and appeal, the eleventh circuit court of appeals reversed. The United States Supreme Court affirmed in part and held that the district court had improperly restricted cross-examination of the plaintiff and "erred in refusing to permit Rainey to present a more complete picture of what he had written to Morgan." *Id.* at 170, 109 S.Ct. at 450. The Court commented that the jury was given a distorted and prejudicial impression of Rainey's letter, and that "Rainey's counsel was unable to counteract this prejudicial impression by presenting additional information

about the letter on cross-examination." *Id.* at 171, 109 S.Ct. at 451. The Court stated:

> In proposing Rule 106, the Advisory Committee stressed that "it does not in any way circumscribe the right of the adversary to develop the matter on cross-examination or as part of his own case." We take this to be a reaffirmation of the obvious: that when one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is *ipso facto* relevant and therefore admissible under Rule 401 and 402.

*Id.* at 172, 109 S.Ct. at 451 (citations omitted). *See also* JOHN W. STRONG, MCCORMICK ON EVIDENCE § 56, at 228 (4th Ed.1992) (if first party introduces a part of a writing, adversary has a right to introduce remainder during his or her own next stage of presenting proof). The trial court therefore erred in excluding portions of the Zobel letter under Rule 106.

### 2. *Violation of Confrontation Rights*

 We also believe failure to permit defense counsel to cross-examine Adamson about the meaning of the excluded portions of the letter violated defendant's Sixth Amendment right to cross-examine witnesses. The state's purpose in reading selected portions of the Zobel letter was to rehabilitate Adamson. Adamson explained during redirect examination that the letter meant he would tell the truth at trial if the state offered him a deal. He suggested that inculpating his friends would be difficult for him. This testimony bolstered the state's position that, despite his immoral character, Adamson was credible. However, defendant was precluded from rebutting this inference by cross-examining Adamson on whether the letter may have also indicated he could be influenced to testify in a certain manner because of a financial motive.

 The right of confrontation, which includes the right to cross-examine witnesses, is a fundamental right. *Pointer v. Texas,* 380 U.S. 400, 403–04, 85 S.Ct. 1065, 1067–68, 13 L.Ed.2d 923 (1965); *State v. Correll,* 148 Ariz. 468, 473, 715 P.2d 721, 726

(1986). Cross-examination may be restricted based on concerns for harassment, prejudice, confusion of the issues, safety of a witness, or marginal relevance. *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). A conviction may be reversed, however, if cross-examination has been unreasonably limited. *Dunlap,* 125 Ariz. at 105, 608 P.2d at 42. In particular, a defendant has the Sixth Amendment right to cross-examine a witness concerning his bias, motive, and prejudice. *Davis v. Alaska,* 415 U.S. 308, 316–18, 94 S.Ct. 1105, 1110–11, 39 L.Ed.2d 347 (1974); *State v. Gertz,* 186 Ariz. 38, 41–43, 918 P.2d 1056, 1059–61 (App.1995). Cross-examination for this purpose is especially important where the credibility of a key government witness is the central factor to be weighed by the trier of fact. *Davis,* 415 U.S. at 317, 94 S.Ct. at 1110–11.

▪ The term "bias" is a "shorthand reference to all forms of partiality that may be proven by extrinsic evidence" and includes interest, motive, and corruption. *In re C.B.N.,* 499 A.2d 1215, 1219 (D.C.App. 1985). Corruption of a witness is defined as the "conscious false intent which is inferable from giving or taking a bribe *or from expressions of a general unscrupulousness for the case in hand.*" 3A WIGMORE, EVIDENCE § 945, at 782 (Chadbourn rev.1970) (emphasis added). The "essential discrediting element is a willingness to obstruct the discovery of the truth by manufacturing or suppressing evidence." *Id.* at 803. Wigmore suggests that "[a] willingness to swear falsely is, beyond any question, admissible as negativing the presence of that sense of moral duty to speak truly which is at the foundation of the theory of testimonial evidence." *Id.*; *see also In re C.B.N,* 499 A.2d at 1219 (willingness to testify falsely goes to the core of the witness' credibility, regardless of his personal or pecuniary relationship with the defendant).

Here, defendant was precluded from examining Adamson regarding a possible inference in the Zobel letter that Adamson might alter his testimony for money, whether to benefit himself or his wife. Although a fair reading of the letter as a whole suggests Adamson might choose *not* to implicate certain individuals for a price, rather than falsely accuse someone, such a suggestion nonetheless goes to the heart of his credibility. The trial court abused its discretion in limiting cross-examination on this point and violated defendant's rights of confrontation.

▪ However, violations of a defendant's confrontation rights may be harmless error. *Van Arsdall,* 475 U.S. at 681, 106 S.Ct. at 1436; *State v. Medina,* 178 Ariz. 570, 577, 875 P.2d 803, 810 (1994). Error is harmless if we can say beyond a reasonable doubt that the error did not affect the verdict. *Medina,* 178 Ariz. at 577, 875 P.2d at 810. "The inquiry ... is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993).

▪ Here, we find the error was harmless. We do not agree with defendant that the only inference the jury could glean from the letter is that Adamson was willing to alter his testimony for money. Indeed, an equally likely inference is that Adamson recognized his testimony must be truthful and only offered to change his inflection, mannerisms, and body language while testifying. Furthermore, defendant thoroughly attacked Adamson's credibility during the lengthy cross-examination. Adamson's testimony clearly was "for sale" in the sense that he used it to first escape the death penalty and then avoid lifetime incarceration after initially refusing to testify at defendant's second trial. As to his reputation for truthfulness, Adamson admitted giving several incorrect statements to state and federal investigators, and lying when it served his needs as a criminal. On many occasions, Adamson said that he was a murderer, burglar, drug dealer, and arsonist who had no qualms about placing a bomb under Bolles' car. Although the trial court improperly prevented defendant's use of the Zobel letter, we cannot see how this one possible inference could have attacked Adamson's credibility more thoroughly than was already accomplished. We are convinced beyond a reasonable doubt that the error only excluded cumulative evi-

dence and did not affect the verdict. *State v. Gallegos,* 178 Ariz. 1, 13, 870 P.2d 1097, 1109, *cert. denied,* 513 U.S. 934, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994); *see also State v. Jeffers,* 135 Ariz. 404, 423, 661 P.2d 1105, 1124, *cert. denied,* 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983).

D. *The Admission of Hearsay Statements.*

1. *Rosalie Bolles*

During cross-examination of police detective George Weisz, defense counsel asked about a 1976 police interview with Rosalie Bolles (the 1976 statement). Over the state's objection, the trial court admitted the report of the interview into evidence. In that interview, Mrs. Bolles said that prior to the bombing, her husband was investigating the Funk family and their connection to organized crime. She added that since the investigation began, they had received threatening phone calls.

During redirect examination, Weisz testified over a hearsay objection about an interview with Rosalie Bolles two weeks before Weisz testified (the 1993 statement). In that interview, Mrs. Bolles told Weisz that at the time of the bombing, her husband had been investigating Kemper Marley and Sam Steiger. She said that Emprise was always a subject of interest to him, but he was not working on the Emprise/Funk matter at that time.

Defendant claims the 1993 statement was inadmissible hearsay and its admission requires reversal. The state claims the 1993 statement was not hearsay and was admissible to rebut a false impression created by defendant that no follow-up investigation was done. The state also claims the evidence was admissible as impeachment evidence under Rule 806, Arizona Rules of Evidence. Finally, the state claims that because defendant was permitted to introduce inadmissible hearsay evidence in the 1976 statement, in the interests of fairness the state should be permitted to do so as well.

 Whether or not to admit evidence at trial is within the trial court's discretion.

*State v. Robles,* 135 Ariz. 92, 94, 659 P.2d 645, 647 (1983). Nonetheless, we conclude Mrs. Bolles' 1993 statement offered by the state was inadmissible hearsay. Contrary to the state's argument that the evidence was used only to disprove defendant's claim the state did an inadequate follow-up investigation, the 1993 statement was offered to prove the truth of the matter asserted, i.e., that Bolles was investigating Kemper Marley at the time of his death. It defies logic to presume that a statement made in 1993 had some bearing on the investigators' decisions in 1976 so as to prove the adequacy of the 1976 investigation.

 Additionally, Mrs. Bolles' 1993 statement was not admissible under Rule 806, Arizona Rules of Evidence, to attack her credibility. That rule only applies when other *hearsay* statements (or certain 801(d)(2) exclusions) by the declarant have previously been admitted. Because defendant elicited Mrs. Bolles' 1976 statement to show the inadequacy of the investigation, and did not offer it for the truth of the matter asserted, it was not hearsay.[2] *See generally* Ariz. R. Evid. 801(c). Under these circumstances, Mrs. Bolles' credibility was irrelevant to the issue whether investigators adequately followed-up information contained in their 1976 reports.

Finally, we disagree with the state that, in the interest of fairness, it should have been permitted to introduce otherwise inadmissible hearsay to rebut the content of Mrs. Bolles' 1976 "hearsay." The state inexplicably relies on *AMERCO v. Shoen,* 184 Ariz. 150, 907 P.2d 536 (App.1995), to support its proposition. First, because the 1976 statement was not inadmissible hearsay, there is no merit to the argument that fairness dictates the admission of additional hearsay in the 1993 statement. Second, *AMERCO* does not advocate the fairness argument proffered by the state. While we disagree with the state's reading of *AMERCO,* we agree with that case's resolution.

There, this court considered whether improper admission of hearsay earlier in the trial justified admission of other related inad-

---

2. Note the state's brief, which reads, "Defense counsel proffered Rosalie Bolles' statement, not for the truth of the matter asserted, but to show that the State did no follow-up investigation."

missible hearsay later in the trial. The court did not find the admission was permissible under the rules of evidence. However, it found the error, if any, was harmless. The court stated, "We do not suggest that trial courts should balance a mistaken admission of hearsay by extending equal hearsay opportunity to the other side. But it is inconceivable in this case that the evidence in question affected the verdict." *Id.* at 164, 907 P.2d at 550.

■ Here, the admission of Mrs. Bolles' 1993 statement, although erroneous, was not so prejudicial that a new trial is warranted. As in *AMERCO,* the evidence did not affect the verdict. The 1993 statement was merely cumulative to other evidence presented by the state on this point. For example, Bernie Winn, a political writer for the Arizona Republic in 1976, testified that Bolles was investigating a story about Kemper Marley at the time of his death. Adamson also testified that defendant wanted Bolles murdered first because of Bolles' soon-to-be-published writings about Kemper Marley. There was no reversible error.

### 2. *Robison Diaries*

Over defense objection, the state introduced into evidence certain entries from Robison's diary written on October 21, 1989, November 30, 1989, and March 18, 1990. The diary had been seized in Robison's prison cell pursuant to a warrant. The trial court ruled the entries were admissible as statements of a coconspirator of a party made during the course and in furtherance of the conspiracy.

■ A statement is not hearsay and is admissible if "the statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Ariz. R. Evid. 801(d)(2)(E). A coconspirator's statements are admissible " 'when it has been shown that a conspiracy exists and the defendant and the declarant are parties to the conspiracy.' " *State v. White,* 168 Ariz. 500, 506, 815 P.2d 869, 875 (1991), *cert. denied,* 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992) (quoting *State v. Baumann,* 125 Ariz. 404, 411, 610 P.2d 38, 45 (1980)). Here,

the state alleged there was a conspiracy between defendant and Robison to cover up their involvement in the Bolles murder and to obstruct the investigation and prosecution of the case.

■ Defendant claims that the diary entries were not made in *furtherance* of the conspiracy and therefore are not admissible under this rule. When inquiring whether a statement of a coconspirator was made in furtherance of the conspiracy, courts focus on the intent of the coconspirator in advancing the goals of the conspiracy, not on whether the statement has the actual effect of advancing those goals. *See United States v. Nazemian,* 948 F.2d 522, 529 (9th Cir.1991), *cert. denied,* 506 U.S. 835, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992) (interpreting federal rule of evidence that is identical to Arizona rule). So long as some reasonable basis exists for concluding the statement furthered the conspiracy, the "in furtherance" requirement is satisfied. *Doerr,* 886 F.2d at 952. We will only reverse if the trial court abused its discretion in determining that statements of a coconspirator met the rule's requirements and were admissible. *See United States v. Jennell,* 749 F.2d 1302, 1307 (9th Cir.1984), *cert. denied,* 474 U.S. 837, 106 S.Ct. 114, 88 L.Ed.2d 93 (1985); *State v. Stanley,* 156 Ariz. 492, 495, 753 P.2d 182, 185 (App.1988). "An 'abuse of discretion' is discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *Torres v. North American Van Lines, Inc.,* 135 Ariz. 35, 40, 658 P.2d 835, 840 (App.1982).

■ Here, we do not find an abuse of discretion. In one entry, Robison wrote, "[C]alled Diane [Fodor] this morning. She settled down over yesterday. It's understandable to me why she's upset about the Bolles case, and I reassure her as best I can, but of course she does not know the complete story, and I cannot tell her." Later, he wrote,

Severance is here. We expect a fight with the Attorney General's office. There is one motion Tom does not have to waste time on. The only reason I can see for giving it to us, they are trying to divide it so it will look like Max will go free, then

they can get me to plea bargain. I see this as the only solid chance they have to conviction [sic]. It will never happen, but they do not know that.

The diary entries are admissible if they reveal an intent to advance the goals of the conspiracy, even if they do not actually advance those goals. To the extent Robison may have used these diary entries to help him formulate or carry out such conspiracy, they would be "in furtherance of the conspiracy." For example, the diary entries may have aided Robison by reminding him of what he had not, and could not, tell Fodor. The entries may also have enabled Robison to understand how trial maneuvers fit into a master plan and understand the relationship of the maneuvers to the conspiracy. Therefore, we cannot say the trial court exercised its discretion in a manifestly unreasonable manner, or on untenable grounds, when it admitted this evidence.

### E. *Was Harold Bone's Grand Jury Testimony Admissible?*

██ Harold Bone, a friend of defendant, testified as a character witness at defendant's first trial. In 1990, he testified before the grand jury in connection with the ongoing investigation of this case. At the time of the grand jury proceeding, Bone was seventy-nine years old and admitted, "[M]y memory is not very good anymore." Bone died prior to defendant's second trial. Over defense objection, the court permitted the grand jury testimony to be read into evidence under Rule 804(b)(5), Arizona Rules of Evidence.

Bone testified he formed a legal defense committee in 1977 to raise funds to pay legal fees to defendant's attorney, John Savoy, and to his knowledge the funds had not gone to either Robison or Bette Gleason. He also testified about an incident in late June of 1976 when his son was in the hospital recovering from serious burns. He said defendant visited his son in the hospital and while there told Bone about the stranger who came to defendant's door on June 10, 1976. Bone said defendant claimed the stranger gave him $5000 and asked defendant to take it to Neal Roberts because Roberts was in trou-

ble. Defendant told Bone that he took the money to Roberts and that Adamson was there. This testimony in part confirmed defendant's assertion that a stranger gave him money to deliver. However, the testimony contradicted defendant's version of the facts about where the money was to be delivered. Defendant argues that the testimony lacked circumstantial guarantees of trustworthiness, was inadmissible under Rule 804(b)(5), and that its admission violated his confrontation rights under the Sixth Amendment. We disagree.

Rule 804(b)(5), Arizona Rules of Evidence, allows the statements of an unavailable witness to be admitted into evidence if they do not fit into another hearsay exception and have "equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."

██ A similar, although not identical standard, is applicable to determine whether the admission of a hearsay statement of an unavailable witness violates the Confrontation Clause of the Sixth Amendment. *See State v. Luzanilla*, 179 Ariz. 391, 394, 880 P.2d 611, 614 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1406, 131 L.Ed.2d 293 (1995); *State v. Valencia*, 186 Ariz. 493, 497, 924 P.2d 497, 501 (App.1996). A statement not falling within a firmly rooted exception must have "particularized guarantees of trustworthiness." *Idaho v. Wright*, 497 U.S. 805, 815, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638 (1990). In determining whether such guarantees exist, courts look to "the totality of circumstances ... that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* at 819, 110 S.Ct. at 3148. We find the testimony contained adequate guarantees of trustworthiness to satisfy the requirements of Rule 804(b)(5) and the Confrontation Clause.

Many federal courts of appeals have considered the admissibility of grand jury testimony under the aforementioned requirements and determined that it is potentially admissible. *E.g., United States v. Donlon,* 909 F.2d 650, 654 (1st Cir.1990); *United States v. Marchini,* 797 F.2d 759, 763 (9th Cir.1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987). Looking at the criteria for admissibility developed in those cases, we conclude the trial court properly determined that Bone's grand jury testimony had sufficient circumstantial guarantees of trustworthiness. Bone was under oath, testified to matters within his personal knowledge, never recanted his testimony, and had no motive to harm defendant by lying. *See Donlon,* 909 F.2d at 654. Bone's relationship with defendant was that of a close friend; Bone had no relationship with the government such as informant or agent. *See Marchini,* 797 F.2d at 763. Furthermore, Bone's testimony was proffered only as circumstantial evidence of defendant's guilt. Thus, the circumstantial guarantees of trustworthiness need not have been as strong as if the evidence was direct or critical proof of defendant's guilt. *Id.; United States v. Barlow,* 693 F.2d 954, 962–63 (6th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983).

Admittedly, defendant did not have the opportunity to cross-examine Bone. Cross-examination provides the opportunity to arrive at the truth by bringing out such matters as the " 'witness' bias, his lack of care and attentiveness, his poor eyesight, and even (what is often a prime objective of cross-examination, . . . ) the very fact that he has a bad memory.' " *State v. King,* 180 Ariz. 268, 276, 883 P.2d 1024, 1032 (1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995) (quoting *United States v. Owens,* 484 U.S. 554, 559, 108 S.Ct. 838, 842, 98 L.Ed.2d 951 (1988)). Here, though, Bone admitted several times in his testimony his memory was poor, he had difficulty remembering the details of the conversation because it occurred many years ago, and he was nearly eighty years old. Moreover, any bias would have been in defendant's favor as Bone was a friend who originally formed and managed defendant's legal defense fund.

While cross-examination is of extraordinary importance in our adversarial system, we conclude that its absence did not vitiate all other circumstantial guarantees of trustworthiness. The trial court did not abuse its discretion in admitting this evidence. *King,* 180 Ariz. at 275, 883 P.2d at 1031 (admissibility of evidence within trial court's discretion).

■ We concede the lack of evidence corroborating Bone's testimony weighs against its admissibility. *See Donlon,* 909 F.2d at 654; *Marchini,* 797 F.2d at 763; *Barlow,* 693 F.2d at 954. However, the presence of corroborating evidence is only one factor among several and it is not dispositive. Even if we concluded the trial court erroneously admitted Bone's testimony, such error was harmless. As mentioned above, the jury was well aware of the weaknesses in Bone's testimony, i.e., his failing memory. Furthermore, Bone's testimony may have bolstered defendant's theory of a stranger handing him money to deliver. Although Bone believed defendant was to give the money to Roberts and not Foster, Bone nevertheless provided additional evidence of defendant's "stranger" theory. Thus, even if the trial court improperly admitted the evidence, any error was harmless.

F. *Improper Impeachment of Defense Witness Foglesong.*

Marley Foglesong was defendant's next-door neighbor in 1976 and subsequently married one of defendant's daughters. He corroborated the "stranger" defense by testifying that on the morning of June 10, 1976, while he was on his way to work, he saw a man at defendant's door give defendant a brown paper bag. In 1980, Foglesong was convicted of vehicular manslaughter arising out of a drunk driving incident and was placed on probation for four years. Before Foglesong testified, the trial court ruled the conviction was not more than ten years old because of the probationary period and the state could impeach Foglesong with the prior conviction. However, the trial court directed the state not to inquire as to the circumstances surrounding the conviction or the punishment imposed. *See generally* Ariz. R. Evid. 609.

During direct examination, Foglesong admitted he had been convicted of vehicular manslaughter. On cross-examination, the prosecutor asked, "Well, you were drink [sic], ran a red light and killed somebody?" Defendant objected and the objection was sustained. Defendant later moved for a mistrial. The court found the question improper but denied the motion.

■ Defendant first argues the prior conviction was presumptively inadmissible under Rule 609(b), Arizona Rules of Evidence, because probation is not confinement and does not extend the time for measuring the ten-year period. We agree.

The court in *United States v. Daniel,* 957 F.2d 162, 168 (5th Cir.1992), held the ten-year period in Rule 609(b) is not calculated from the termination of probation. Before 1972, the federal rule, the source of the Arizona rule, used the expiration of the period of parole, probation, or sentence to calculate the ten-year period. However, an amendment to the rule specified that the calculation is from the release from confinement. *Id.* Thus, the trial court erred when it determined Foglesong's conviction was less than ten-years-old and was admissible for impeachment because his probationary term ended in 1984.[3] However, the error is harmless if the verdict would not have been influenced by the admission of the prior conviction as impeachment evidence. *People v. Diaz,* 101 Ill.App.3d 903, 57 Ill.Dec. 273, 285, 428 N.E.2d 953, 965 (1981); *see also Ennis,* 142 Ariz. at 318, 689 P.2d at 577 (court examined whether, beyond a reasonable doubt, admission of a defendant's stale conviction for impeachment did not contribute significantly to the verdict).

■ Here, we find beyond a reasonable doubt that Foglesong's prior conviction did not influence the verdict. The jury knew that Foglesong was defendant's son-in-law and may have been biased in favor of defendant. Foglesong's testimony was inconsistent with defendant's account of the stranger's appearance as well; defendant told police the stranger was Mexican while Foglesong said the man was white. Foglesong's credibility was not significantly affected by the erroneous admission of his conviction. *See Diaz,* 57 Ill.Dec. at 285, 428 N.E.2d at 965 (defense witness' credibility not affected by improper admission of eighteen-year-old conviction because of inconsistencies in testimony). We conclude that, beyond a reasonable doubt, the error did not contribute significantly to the verdict.

■ Once the trial court allowed the introduction of evidence of Foglesong's conviction, the prosecutor should not have compounded the problem by inquiring about the underlying facts of the conviction. *See State v. Tucker,* 157 Ariz. 433, 448, 759 P.2d 579, 594 (1988) (impeaching a witness under Arizona law with prior felony conviction is limited to showing the fact of the conviction, the name of the crime, the place, and the date). Contrary to the state's argument, defendant did not open the door to this improper inquiry by asking Foglesong in general terms about his prior conviction. Nonetheless, because the prejudicial effect was not great, we do not believe the trial court abused its discretion in denying the motion for mistrial on this ground. *State v. Bailey,* 160 Ariz. 277, 279, 772 P.2d 1130, 1132 (1989). The state did not again refer to the details of Foglesong's conviction. Furthermore, the trial court sustained the objection to the state's question and instructed the jury to disregard any questions to which objections were sustained. Juries are presumed to follow their instructions. *Zafiro v. United States,* 506 U.S. 534, 540, 113 S.Ct. 933, 938–39, 122 L.Ed.2d 317 (1993); *see also State v. Schad,* 129 Ariz. 557, 568, 633 P.2d 366, 377, *cert. denied,* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982) (no presumption that juries will disobey instructions).

### G. *Was the Prosecutor's Closing Argument Improper?*

Defendant claims the prosecutor engaged in improper vouching and presented personal opinion during closing argument.

---

**3.** The trial court did not make an on the record finding that the conviction's probative value substantially outweighed its prejudicial effects despite its age. Thus, the trial court did not satisfy the exception to the temporal limitation on the admissibility of prior convictions for impeachment in Rule 609(b). *See State v. Ennis,* 142 Ariz. 311, 317–18, 689 P.2d 570, 576–77 (App. 1984).

## 1. *Vouching*

Prosecutorial vouching occurs either "(1) where the prosecutor places the prestige of the government behind its witness; (2) where the prosecutor suggests that information not presented to the jury supports the witness's testimony." *State v. Vincent,* 159 Ariz. 418, 423, 768 P.2d 150, 155 (1989). The first type of vouching consists of personal assurances of a witness' truthfulness. The second type involves prosecutorial remarks that bolster a witness' credibility by reference to material outside the record. *State v. King,* 180 Ariz. 268, 277, 883 P.2d 1024, 1033 (1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995). Because defendant did not object to the challenged comments, the issue is waived absent fundamental error. *State v. Roscoe,* 184 Ariz. 484, 497, 910 P.2d 635, 648 (1996).

Here, while discussing Neal Roberts' role in the bombing, the prosecutor said,

If Neal Roberts was actually involved in the planning, or if he had a motive, if he wanted to have Don Bolles killed, he was in on it with Max Dunlap, then perhaps we can try Neal Roberts sometime. That's not for you to really decide. You need to decide whether or not Max Dunlap did this; that's your primary purpose. When you go into that jury room, *you are not to worry about whether or not Neal Roberts was also involved, that's our job.*

Defendant contends this italicized language implied that the state had insider knowledge regarding Roberts' involvement and could still prosecute Roberts because of this insider knowledge. Thus, the jury would believe the state had other evidence not presented at trial that explained the state's failure to pursue Roberts at this time. Therefore, the jury would disregard defendant's theory that Roberts was behind the murder and had set up defendant.

When read in context, however, the statement is not improper. The argument simply informed the jury that the state might still pursue Roberts if the evidence arises. It also focused the jury on their duty in this case, determining whether defendant was guilty. Moreover, the trial court similarly instructed the jury:

It is no defense to the crime charged against the defendant that another person or persons not now on trial might have participated or cooperated in the crime. You should not guess the reason for the absence from the courtroom of such other person or persons. The only matter before you is the guilt or innocence of Max Dunlap.

Although the italicized portion of the closing argument inartfully made this point, it did not constitute improper vouching. We cannot ascribe to it the sinister connotations that defendant does.

Defendant also points to this language in the prosecutor's argument:

After this case is over, after you have rendered a verdict, *if you want to talk to us about anything about the case, you can talk to us if you want to privately. We'd like to talk to you privately. We'd like to talk to you about credibility of witnesses.* If you don't want to talk to us, you simply say, you know, this is private. We will respect your privacy, we won't talk to you, it will be over with for you.

Defendant argues that the italicized portion implies that information outside the record bolsters the state witnesses' credibility.

First, we believe the statements, when read in context, indicate the prosecutors wanted to collect feedback from jurors regarding their presentation of the case—a common self-improvement technique among litigators. Indeed, the trial court told the jury the same thing when he twice indicated his availability to discuss the case after trial. Although the prosecutor could have selected his words more prudently, his statements were not improper when read in context.

Even if the prosecutor was vouching, the conduct did not unfairly prejudice defendant or deny him the right to a fair trial. *State v. Dumaine,* 162 Ariz. 392, 403, 783 P.2d 1184, 1195 (1989) (to warrant reversal, prosecutor's comments in closing argument must be so egregious that defendant is denied a fair trial). Because the statements were subject to more than one interpretation, and were rather obscure, we find this case is

similar to others in which prosecutorial misconduct did not require reversal. *Cf. State v. White,* 115 Ariz. 199, 203–04, 564 P.2d 888, 892–93 (1977) (improper comment on credibility of state's witness did not require reversal); *State v. Islas,* 119 Ariz. 559, 561, 582 P.2d 649, 651 (App.1978) (prosecutor's statement that state would not waste time bringing a case if the investigating officer were not believed did not require reversal). Furthermore, the trial court twice instructed the jury that counsels' arguments were not evidence, thus mitigating the effects of the statements.

### 2. *Prosecutor's Personal Opinion*

■ Later in his argument, without objection, the prosecutor used his personal opinion to justify Adamson's efforts to obtain a better plea bargain after defendant's first trial. Discussing Adamson's demand for a better deal before testifying in defendant's second trial, the prosecutor said, "Instead of the prosecutor countering with another offer, which by the way sounds like what I would do...." He added, "John [Adamson] had a legitimate reason to renegotiate, or at least try to renegotiate his contract." Adamson "had a right to be upset a little bit. I am not saying we did it exactly right back in those days.... John Adamson was not completely at fault for the falling out between him and the Attorney General's office, but there was one." The prosecutor also told the jury that Adamson had no motive to lie for the state since he was no longer subject to the death penalty. To rebut this statement, during closing argument, defendant's counsel told the jury that in the absence of the plea agreement, Adamson would be in prison for life without possibility of parole, and he did have a motive to testify favorably for the state. Because defendant did not object, the issue is waived except for fundamental error.

■ Much of the challenged comments simply are arguments that Adamson was telling the truth because he is no longer subject to the death penalty. Although the comments failed to mention Adamson's exposure to life imprisonment without the plea agreement, defense counsel's closing argument clarified any misunderstanding. However,

the comments in part express the prosecutor's personal opinion that Adamson justifiably sought a better plea bargain. Argument containing personal opinion is improper because it is not based on the evidence or reasonable inferences that may be drawn from the evidence. *See State v. Bailey,* 132 Ariz. 472, 478, 647 P.2d 170, 176 (1982). Defendant believes the comments improperly bolstered Adamson's credibility by referring to material outside the record (the prosecutor's opinion). *See King,* 180 Ariz. at 277, 883 P.2d at 1033; *Vincent,* 159 Ariz. at 423, 768 P.2d at 155. While the comments referred to material outside the record, we think they negligibly bolstered his credibility, if at all. The comments did not, for example, hint that other evidence existed supporting or corroborating Adamson's testimony. Even if the comments had the potential to bolster Adamson's credibility, they did not unfairly prejudice defendant or deny him the right to a fair trial. The jury knew the Arizona Supreme Court found Adamson was bound by the original plea bargain and was not justified in his efforts to obtain a better deal, regardless of the prosecutor's opinion. Also, as mentioned above, the trial court instructed the jury that the arguments were not evidence. The comments did not constitute fundamental error.

### H. *Refusal to Give Willits Instruction.*

Although requested by defendant, the court refused to give a *Willits* instruction. *See generally State v. Willits,* 96 Ariz. 184, 393 P.2d 274 (1964).

■ In order to be entitled to a *Willits* instruction, a defendant must prove (1) that the state failed to preserve material evidence that was accessible and which might tend to exonerate him and (2) that the failure resulted in prejudice to the defendant. *State v. Leslie,* 147 Ariz. 38, 47, 708 P.2d 719, 728 (1985). Absent an abuse of discretion, this court will not reverse a trial court's decision to forego a *Willits* instruction. *State v. Bolton,* 182 Ariz. 290, 308–09, 896 P.2d 830, 849–50 (1995). A trial court does not abuse its discretion when it denies a request for a *Willits* instruction where a defendant fails to establish that the lost evidence would have

had a tendency to exonerate him. *Bolton,* 182 Ariz. at 309, 896 P.2d 830; *State v. Atwood,* 171 Ariz. 576, 627, 832 P.2d 593, 644 (1992), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993).

Here, although the state failed to preserve evidence that was accessible to it, defendant has not shown the evidence would have tended to exonerate him or that he suffered actual prejudice as a result of the state's failure to preserve the evidence. The specific contents of the allegedly missing portion of the 76–86 file and the documents removed from the Emprise file are unknown. The information contained in the surveillance worksheets was transferred to the surveillance reports, and there is no evidence the worksheets contained exculpatory information. Defendant's claim that the destroyed or lost files would have supported his theory of the case entitling him to a *Willits* instruction is entirely speculative. The trial court did not abuse its discretion.

## I. *Were the Jury Verdicts Coerced?*

On April 6, 1993, prior to deliberations, the judge gave the standard instruction to the jury that it had to reach unanimous verdicts. On April 14, 1993, the jurors notified the court they were deadlocked. The judge did not ask the jurors whether there was a reasonable possibility of reaching a verdict. Instead, over objection, the judge gave the jury a form of *Allen*[4] or "dynamite" charge,[5] telling the jurors they had not "deliberated nearly long enough." He asked the jurors if they were having difficulty with any instructions before sending them back to the jury room. None of the jurors indicated they had any difficulties, although the foreperson asked if there was an instruction to help them through their impasse. The trial court stated that it could only refer the jury to the instructions already given. Five days later, on April 19, 1993, the jurors advised the court that they had reached a verdict on count II but were deadlocked on count I. The

trial court gave additional instructions designed to help the jury's deliberations.

Defendant claims the court's actions in telling the jurors they had not deliberated long enough and giving the *Allen* charge after the jury was deadlocked requires reversal. The totality of circumstances must be considered in determining whether the defendant "received a fair trial at the hands of an independent jury, the members of which were free from intimidation or undue pressure." *State v. Lautzenheiser,* 180 Ariz. 7, 9, 881 P.2d 339, 341 (1994). The court will find coerciveness if, under the totality of the circumstances, the trial court's actions or remarks displaced the independent judgment of the jurors. *State v. McCutcheon,* 150 Ariz. 317, 320, 723 P.2d 666, 669 (1986).

### 1. *The April 14, 1993, Allen charge.*

As to the *Allen* charge of April 14, 1993, we do not find that it denied defendant a fair trial from an independent jury. Indeed, cases continue to acknowledge the propriety of the *Allen* charge. *E.g., United States v. Easter,* 66 F.3d 1018, 1023 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 547, 133 L.Ed.2d 450 (1995); *United States v. Arbelaez,* 719 F.2d 1453, 1461 (9th Cir.1983), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984). Here, as in *Easter,* the trial court did not know the numerical division of the jurors' votes or which way the jury was leaning. There was no reason for a juror to believe the *Allen* charge was aimed at him or her or at jurors inclined to vote one way or the other. *Easter,* 66 F.3d at 1023. The charge did not coerce the verdicts.

### 2. *The April 19, 1993, supplemental instruction.*

Defendant argues this language in the trial court's supplemental jury instruction of April 19, 1993, was particularly harmful: "It is desirable if you reasonably can agree upon a verdict. *For the parties involved in*

---

**4.** *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

**5.** Such charge is a supplemental instruction the court gives to encourage a jury to reach a verdict

after that jury has been unable to agree after some period of deliberation. *United States v. Nickell,* 883 F.2d 824, 828 (9th Cir.1989).

*the case it is an important one, and there is no reason to believe that the case could ever be submitted to a jury more competent to decide it"* (emphasis added). Admittedly, our supreme court twice disapproved of this instruction. *State v. Glover,* 159 Ariz. 291, 294–95, 767 P.2d 12, 15–16 (1988); *State v. Smith,* 108 Ariz. 121, 124, 493 P.2d 904, 907 (1972).[6] The *Glover* court reversed on other grounds. The *Smith* court disapproved of the language but found it was not a ground for reversal under the circumstances. Thus, while disapproving of the language, the supreme court has never reversed a conviction because of it.[7] Furthermore, the supreme court has not specified what particular language in the instruction is objectionable. The only indication as to why the instruction is proscribed is "the instruction might tend to impermissibly pressure jurors to reach a verdict." *Glover,* 159 Ariz. at 295, 767 P.2d at 16.

Here, we do not find the instruction impermissibly pressured the jurors to reach a verdict. In *United States v. Miranda,* 986 F.2d 1283 (9th Cir.1993), *cert. denied,* 508 U.S. 929, 113 S.Ct. 2393, 124 L.Ed.2d 295 (1993), the trial court gave this instruction when the jury indicated it was evenly split on two counts:

> This case has taken a great deal of time and effort to prepare and try. There is no reason to think it could be better tried or that another jury is better qualified to decide it. Thus, it is important that you reach a verdict if you can do so conscientiously.

*Id.* at 1286. Four hours later, that jury returned the verdicts. Affirming the convictions, the court of appeals noted it had upheld analogous instructions and the circumstances of the case demonstrated no coercive effect on the jury. *Id.* Similarly, the circumstances here demonstrate no coercive effect on the jury. The trial court implored the jurors to maintain their independent judgment:

> This instruction is offered to help your deliberations, not to force you to reach a verdict. * * * I do not wish nor intend to force a verdict, I am merely trying to be responsive to your apparent need for help. * * * Each juror has a duty to consult with one another, to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment. * * * No juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors or for the purpose of returning a verdict. * * * I would ask that you return to the jury room, keeping in mind what I told you about trying to resolve any disagreement among yourselves without doing violence to your conscience....

These additional instructions made it clear that the trial court was not pressuring the jurors to sacrifice their convictions to reach a verdict. Furthermore, the trial court did not know the numerical division of the jurors' votes or whether the jury favored a particular verdict. Thus, no particular juror would have believed the instructions were aimed at him or her. *See Easter,* 66 F.3d at 1023. While the trial court should not have used the instruction, it did not impermissibly pressure jurors to reach a verdict or deny defendant a fair trial by an independent jury.

### J. Did the Trial Court Properly Deny the Motion to Vacate Judgment?

 Defendant filed a motion to vacate judgment on the ground of newly-discovered evidence. *See generally* Ariz. R.Crim. P. 24.2(a)(2). He argued, among other things, that the testimony of co-defendant Robison at Robison's second trial constituted newly-discovered evidence. Robison had asserted his constitutional privileges and was unavailable to testify at defendant's trial. Defen-

---

**6.** The instruction in *Smith* was a modified version of the so-called "Voeckell" instruction. *State v. Voeckell,* 69 Ariz. 145, 148, 210 P.2d 972, 974 (1949).

**7.** In *State v. Thomas,* 86 Ariz. 161, 342 P.2d 197 (1959), the court reversed when similar instructions were given. There, the jury received the instructions at midnight and continued deliberating until 2:30 a.m. The instructions also instructed dissenting or minority jurors to reconsider the correctness of their positions. The dissimilarities from the case at hand are overwhelming.

dant contends that Robison's testimony would have affected the outcome of that trial. Robison testified about gifts defendant had given him in prison and testified that defendant had not offered the gifts to obtain his silence. He also testified about conversations he had with Adamson regarding who was responsible for the bombing and testified that defendant was not involved.

A motion to vacate judgment under Rule 24.2(a)(2) on the ground of newly-discovered evidence is evaluated under the standards of Rule 32.1, Arizona Rules of Criminal Procedure. There are five requirements to obtain relief under Rule 32.1(e): (1) it must appear from the motion that the evidence relied on was discovered after trial; (2) the motion must allege facts from which the court can infer due diligence; (3) the evidence relied upon must not be merely cumulative or impeaching; (4) the evidence must be material to the issue involved; and (5) it must be evidence that would probably change the verdict if a new trial were ordered. *State v. Mauro*, 159 Ariz. 186, 207, 766 P.2d 59, 80 (1988). Absent an abuse of discretion, this court will not disturb a trial court's determination that a new trial for newly-discovered evidence is not necessary. *State v. Serna*, 167 Ariz. 373, 374, 807 P.2d 1109, 1110, *cert. denied*, 502 U.S. 875, 112 S.Ct. 214, 116 L.Ed.2d 172 (1991).

The central question is whether the admission of the "new" evidence would have changed the outcome of defendant's trial. *See State v. Fisher*, 176 Ariz. 69, 75, 859 P.2d 179, 185 (1993); *State v. Morrow*, 111 Ariz. 268, 270, 528 P.2d 612, 614 (1974). A motion for new trial is properly denied if the testimony of a proffered witness does not appear reliable or credible to the trial court. *Jeffers*, 135 Ariz. at 426, 661 P.2d at 1127; *State v. Mason*, 105 Ariz. 466, 468, 466 P.2d 760, 762 (1970) (trial court did not abuse discretion in denying motion for new trial where court found asserted new witness was not credible and his testimony would not likely influence jury on a retrial).

Here, the trial court denied the motion because it found Robison was not credible. Robison had admitted at his trial that he had lied under oath on other occasions and

"would have no hesitation in testifying to whatever he felt was expedient." The trial court concluded that the introduction of this testimony at a new trial would not have changed the verdicts. The trial court did not abuse its discretion in reaching this conclusion and denying the motion.

Moreover, we conclude Robison's testimony was not "newly-discovered." Federal courts overwhelmingly do not consider evidence newly-discovered when a defendant who voluntarily chose not to testify comes forward later to offer testimony exculpating a co-defendant. *United States v. Dale*, 991 F.2d 819, 838–39 (D.C.Cir.), *cert. denied*, 510 U.S. 906, 114 S.Ct. 286, 126 L.Ed.2d 236 (1993); *United States v. Reyes–Alvarado*, 963 F.2d 1184, 1188 (9th Cir.), *cert. denied*, 506 U.S. 890, 113 S.Ct. 258, 121 L.Ed.2d 189 (1992); *United States v. Lockett*, 919 F.2d 585, 591 (9th Cir.1990). Furthermore, a new witness who chose not to testify based on an attorney's advice was not prevented from testifying for purposes of the newly-discovered evidence requirement. *Reyes–Alvarado*, 963 F.2d at 1188. Although Robison's testimony may be considered "newly-available," we agree with the federal view that such evidence is not newly-discovered and is not sufficient to vacate the judgment. The trial court did not err when it denied this motion.

## CONCLUSION

For the foregoing reasons, we affirm defendant's convictions and sentences.

WEISBERG, P.J., and GRANT, J., concur.