647 P.2d 170

**STATE of Arizona, Appellee,**

v.

**Randall Eugene BAILEY, Appellant.**

**No. 5118.**

Supreme Court of Arizona,
In Banc.

June 1, 1982.
Rehearing Denied June 29, 1982.

---

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, and Greg A. McCarthy, Asst. Attys. Gen., Phoenix, for appellee.

Jose M. Lerma and Ruben Teran Sonoqui, Douglas, for appellant.

CAMERON, Justice.

Defendant, Randall Eugene Bailey, was convicted on 15 July 1980 of first degree murder of Edwin Jeffrey in violation of A.R.S. § 13–1105, and theft of Jeffrey's automobile in violation of A.R.S. § 13–1802. He was sentenced for the murder, pursuant to A.R.S. § 13–703, to life imprisonment with no possibility of parole for 25 years. His sentence of 5 years for the theft was ordered to run concurrently to the life sentence. We have jurisdiction of this appeal pursuant to A.R.S. § 13–4031.

We must consider only one question and that is: Did instances of alleged prosecutorial misconduct constitute reversible error?

The facts necessary to a determination of this appeal are as follows. Defendant, Randall Eugene Bailey, and the victim, Edwin Jeffrey, were engaged in the illegal sale of drugs in Monterey, California. Upon Jeffrey's discharge from the Army, they planned a camping trip to Arizona, where they intended to buy a quantity of marijuana for resale in California. They left Monterey on Monday, 17 June 1979. En route to the purchase in Arizona, both defendant and Jeffrey ingested large amounts of marijuana, amphetamines and LSD. On Thursday, 20 June 1979, the two decided to camp for the night near Sorin Pass, a campsite off Middle March Road in the Coronado National Forest. About midday, they both took LSD and Bailey took the last "hit" of the LSD that evening. During the evening, Bailey alleges that he became increasingly apprehensive of Jeffrey, who he perceived was playing with his knife and watching him. Sometime before dawn, Bailey testified that he saw Jeffrey armed with a knife and moving toward him. Defendant stated that he seized his sawed-off shotgun and fired from a distance of several feet, killing Jeffrey. Bailey bundled Jeffrey's body in his sleeping bag and blankets, tied it with a cord and covered it with sand in a nearby wash. He then collected items around the campsite, including Jeffrey's watch and what remained of his army severance pay, loaded them into Jeffrey's car, and returned to Monterey.

Defendant was arrested in Monterey, returned to Arizona and tried for the murder of Jeffrey. Defendant claimed self defense and alternatively that his perception of an attack, if not real, was imagined as a result of the LSD. Bailey also defended on the basis that his long history of drug abuse, particularly the heavy use of drugs during the 4 days preceding the homicide, rendered him insane at the time of the killing. From a jury verdict and judgment of guilt to the murder and theft, defendant appeals.

The defendant urges that the prosecutor was guilty of misconduct at the trial which denied the defendant a fair trial. He argues that this misconduct was sufficiently prejudicial to warrant reversing the case and remanding it for a new trial. Four examples are given in the brief.

a. Weeping prosecutor and detective

The first incident cited by the defense occurred when Mrs. Jeffrey, the mother of the victim, was testifying on cross-examination. During Mrs. Jeffrey's testimony, the prosecutor and the case officer were in tears. The defense moved, in chambers, for a mistrial which was denied. The court stated:

"I observed both Mr. Riley and Lieutenant Buvia with red eyes and tears and I particularly watched the Jury and I didn't observe any of the Jurors in tears, nor any of them paying particular attention to Mr. Riley or Lieutenant Buvia, although I am satisfied that at least some of them noticed it."

The court concluded that the emotion was genuine. It stated:

"I am not able to judge the—I don't want to have a trial on whether or not this has been staged or authentic. I have to assume it was spontaneous and uncontrollable and unanticipated and for that reason, I am going to deny the Motion for a Mistrial."

b. Improper questioning

Defendant next contends that improper questioning by the prosecutor throughout

the trial resulted in prejudicial error. Specifically, he cites a remark made by the prosecutor during the testimony of Deputy Bob Randall in describing the scene of the killing.

"THE WITNESS: Going back to the scene, I, after looking where the rock was at and possibly what had happened, I concluded that the rock was under or near the body at the time of the death and upon cleaning the campsite, the rock was obviously tossed in an effort to dispose of it.

"THE COURT: Wait a minute, Deputy Randall. You concluded that the rock was near the body from the condition of the rock?

"THE WITNESS: No, sir, just the way, where it was at and why it was there.

"MR. RILEY: Maybe I can assist the Court by asking another question.

"THE COURT: What Deputy Randall is saying, I think, in essence is that the rock was not originally in that position, but where it was, that is pure conjecture, is it not, Mr. Riley?

"MR. RILEY: Except for the fact that it had blood on it.

\* \* \* \* \* \*

"THE COURT: Well, okay. I don't want to argue that point, but I want Counsel to approach the bench, please.
(Court and Counsel confer at the bench.)

"THE COURT: Okay, Jim, you said that rock had blood on it. I don't recall—

"MR. RILEY: What appeared to be blood.

"THE COURT: I don't recall there is any testimony that it had blood on it.
Do you have a lab report?

"MR. RILEY: It disappeared from the top of the Substation and Deputy Randall and Jim Hemenway have both testified that it had what appeared to be blood on it. That is why Deputy Randall was concluding it was near the body at the time of the killing.

"THE COURT: You said it had blood on it. You are doing more testifying that you ought to be, Jim.

"MR. RILEY: We can correct the record and I can correct my question in front of the jury.

"MR. LERMA: Well, I objected to that question. I thought it was improper to ask Officer Randall, but I anticipated precisely the type of response that was received.

I think this is highly prejudicial to allow Deputy Randall to speculate as to what might have happened based on the sketchy evidence and based on his little expertise as a police officer. I don't think that was established and I think it is so prejudicial that I would request a mistrial at this time.

"MR. RILEY: Oh my God.

"THE COURT: I am going to deny the Motion for Mistrial.

I am going to instruct the Jury both on your comment and on what Deputy Randall has testified to.

\* \* \* \* \* \*

"THE COURT: * * * I am also going to tell the Jury to disregard your comment that there was blood on it.

"MR. RILEY: Certainly, Your Honor.
(The following proceedings took place in open court.)

"THE COURT: We are on the record.
Ladies and gentlemen, you recall in the beginning of the trial I instructed you and I am going to instruct you again that what the lawyers say is not evidence, either in their opening statements or their closing arguments. What they say is not evidence even any comments they make during the trial is not evidence.

\* \* \* \* \* \*

I am going to also instruct the Jury to disregard Mr. Riley's statement that it had blood on it. Ladies and gentlemen, the testimony today from my recollection is that it was red. You have seen photographs and that it appeared to be blood. We have no testimony yet that there is, in fact, blood on that rock."

c. Reference to the gloves

Over defendant's objection, a pair of white gloves, found in defendant's possession, was introduced into evidence. When the defendant took the stand, the county attorney cross-examined the defendant as follows:

"BY MR. RILEY:

"Q Now, Mr. Bailey, would you characterize these gloves as surgical gloves?

"A I believe they are.

"Q They are very, very thin, is that correct?

"A Yes, they are.

"Q As a matter of fact, you can see through them, is that correct?

"A They are translucent.

"Q What did you tell us yesterday, or the day before, that you used those gloves for?

"A Working with chemicals, plant food, various things, administering to the cat, anything where I didn't want to get chemicals on my hand.

"Q What were you administering to the cat that was so caustic?

"A There were various salves, actually I was—it wasn't caustic, but I have put salve on cuts and I did not really want to use my bare hand on a cut.

 * * * * * *

"Q Isn't it a fact, Mr. Bailey, that when you put on a pair of gloves like these, you protect your hand in a sense of not leaving any fingerprints, but you do not reduce the [tactile] ability of your fingers in any sense?

"A That is a possibility.

"Q So, they are burglar's gloves, aren't they, Mr. Bailey?"

Objection to the question was sustained. The question was stricken and the jury instructed to disregard it. Defendant argues that the suggestion he was a burglar constitutes reversible error.

d. Comments on Dr. Hirsch's testimony

Finally, defendant asserts that the prosecutor's remarks unfairly impugned the professional integrity of a defense witness, Dr. Hirsch, to the prejudice of the defendant.

The State argued that the killing was deliberate and premeditated. Bailey, on the other hand, contended that he shot the victim in self defense. If the wound were a "tight contact" wound, that is, a wound from a shot made close or next to the body, it would indicate that the victim was shot while asleep or, at least, not while attacking the defendant, and the defendant's story would be discredited. The State had produced a pathologist who had examined the body and had testified that the wound was a "tight contact" wound. Dr. Hirsch, the defendant's pathologist, testified from a photograph that the wound was not a close contact wound, but that the gun was fired from a distance of from 18 inches to 8 feet.

In his opening argument, the prosecutor stated:

"For any competent pathologist to pick up a photograph or a slide without having attended the autopsy and saying: that is consistent with a pellet marking—baloney. I don't know why he would get up here in Court and say that. I honestly don't know, but it is so lacking in foundation and scientific objectivity as to be laughable.

* * * Do you honestly believe that, ladies and gentlemen? I asked Doctor Hirsch if he honestly believed that and he said yes, without any basis in fact or scientific evidence to support it. He believes it because it supports the Defense theory that was paying his bill.

Now let's compare the two men, Doctor Froede and Dr. Hirsch. It is a sad fact, but Doctor Hirsch is, I would suppose, marginally competent in his field, never had any formal training in the field of pathology. The extent of—

"MR. LERMA: I am going to have to object. I think that Mr. Riley is misstating the evidence.

"THE COURT: I think the evidence is contrary on that point, Mr. Riley.

"MR. RILEY: Your Honor, I believe that Doctor Hirsch testified that he has had training in the field of pathology, supervision, on the job training, but nev-

er any formal medical training in an institution for pathology.

"MR. LERMA: Your Honor, he testified as to various institutions where he received his training.

"THE COURT: He did testify he had formal training, Mr. Riley.

You may proceed.

"MR. RILEY: Ladies and gentlemen, it is up to you to decide whether the training that Doctor Hirsch received was formal or not, but he didn't get it in medical school. He got it in his internship under the supervision of other men. So, what he learned, he did not learn in an intensive program of education, he learned piecemeal as he went through his career. Dr. Froede, on the other hand, you heard his credentials. That man has had formal training to the point that it is almost a wonder that he is out in the field doing autopsies to the extent of the training that he has had. Secondly, you found that Doctor Hirsch no longer does the autopsies for Cochise County. Guess why? You also heard that as of July the 1st, his contract, his personal contract—

"MR. LERMA: Your Honor, I am going to object to this. There was absolutely no evidence which leads to the inferences that Mr. Riley is now trying to implant in the jury."

In chambers, the prosecutor was admonished that he was arguing beyond the scope of the record and drawing inferences from facts not in evidence. The defense moved for a mistrial, which was denied. Upon resuming the proceedings, the court instructed the jury:

"Ladies and gentlemen, I am going to direct you to disregard comments made by Mr. Riley, the State's attorney, that makes reference to formal training of Doctor Hirsch, that says anything about his retirement or present position or why he is not doing autopsies for Cochise County. Those are facts to be determined by you. You, ladies and gentlemen, heard the testimony on that matter."

In his closing argument, the prosecutor again discussed Dr. Hirsch's qualifications:

"Now, we all hash over the qualifications of the experts in this case. I regret that I had to say some very unkind things about Doctor Hirsch. Ladies and gentlemen, it was necessary to call to your attention the fact that Doctor Hirsch came in here and was willing to give you an expert opinion based upon photographs, just photographs. * * * He never saw that body. From a photograph like the ones that Mr. Lerma held up, he is willing to say that that mark on the wrist is consistent with a pellet mark, that the mark on the chin is consistent with either a pellet mark or with powder stippling. That is just not reasonable. He was not at the autopsy. Perhaps that might have been some kind of mark that got there in the transportation of the body. He doesn't know any of these things. He was willing to say, based on looking at a photograph, that that was consistent with a pellet wound or consistent with powder stippling. Okay. Now, in absolute, literal fact, true, they are consistent, their appearance would be consistent, but for an objective scientific person to come into this courtroom and try to persuade your verdict on the merest of possibilities is nonobjective, nonprofessional and unethical. The fact had to be called to your attention."

The defense again objected and was overruled.

We agree with the trial court's determination concerning the weeping of the prosecutor and the officer. The trial court was able to observe both counsel and the jury, and we must rely upon his finding that the weeping was "spontaneous" and genuine, and that the jurors did not pay "particular attention to Mr. Riley or Lieutenant Buvia." As to the three remaining examples of prosecutorial misconduct, we believe there was error. The prosecutor's reference to blood on the rock was clearly improper. An attorney may not refer to evidence which is not in the record or "testi-

fy" regarding matters not in evidence. *State v. King*, 110 Ariz. 36, 514 P.2d 1032 (1973); *State v. Ballantyne*, 128 Ariz. 68, 623 P.2d 857 (App.1981); *State v. Harrington*, 27 Ariz.App. 663, 558 P.2d 28 (1976). The white gloves had no connection to the murder, and the county attorney's reference to the gloves as being "burglar's gloves" was improper, implying that the defendant had committed prior bad acts. Innuendo can be impossible to refute convincingly, and the prosecutor may not impeach the defendant by prior bad acts or making insinuations to matters which are not properly admissible. *State v. Enriquez*, 102 Ariz. 402, 430 P.2d 422 (1967).

The unfair and unfounded remarks regarding Dr. Hirsch were most damaging. There was no testimony that the doctor was less than a qualified pathologist. Dr. Hirsch's qualifications included graduation from N.Y.U. College of Medicine and 4 years of special training in pathology in New York and Cleveland. He served as medical examiner for Pima County for 33 years and was certified by the American Board of Pathology in Clinical Pathology and in Anatomic Pathology, as well as the American Board of Forensic Pathology. He was a member of the American Academy of Forensic Science and the National Association of Medical Examiners. Prior to testifying, he reviewed the report of the autopsy of Dr. Froede. He also examined the sleeping bag and the photographs taken at the autopsy. On cross examination he testified:

"BY MR. RILEY:

"Q Doctor Hirsch, the primary fact that we need to establish is that you, yourself, did not do the autopsy in this case, that's right, isn't it?

"A Yes, that is correct.

"Q All right.

You have never even seen the body of Edwin Jeffrey, have you?

"A That is correct.

"Q Now, the sole source of your information in this case has been photographs and Doctor Froede's report?

"A Yes.

"Q Now, Doctor, as an objective scientific person, you are not testifying to the Jury and trying to tell them that you can make specific determinations based on those photographs, are you?

"A As I told you earlier, Mr. Riley, I don't want to be put in the position of second guessing what Dr. Froede has said or done, I wasn't there. He was the one that did the autopsy.

On the other hand, I can draw some conclusions based on what he has written and what the photographs are or at least I can draw conclusions, I can raise certain questions which I think should be answered."

 Counsel are given wide latitude in argument, but their comments must be based on the evidence or reasonable inferences which may be drawn from it. *State v. Mincey*, 130 Ariz. 389, 636 P.2d 637 (1981); *State v. King*, supra. Arguing matters which are not in evidence can be reversible error. We have stated:

"We think the prosecutor's remarks, whether intended as such or not, dragged into the case by insinuation and suggestion matters that were collateral and irrelevant. The remarks, coming as they did in the closing argument to the jury, could not help but to have left the impression in the mind of the jury that the county attorney actually had such facts at hand and that probably there was some truth to the insinuations. We do not and cannot condone the use of such an avenue of improper argument to secure the conviction of one charged with a crime for it does not comport with the spirit of fairness which is one of the most basic tenets of the administration of criminal law." *State v. Neil*, 102 Ariz. 299, 300, 428 P.2d 676, 677 (1967).

 The record does not support the inference of the prosecutor that Dr. Hirsch was not qualified as an expert in his field or that he was "nonobjective, nonprofessional and unethical." It is proper impeachment to inquire into the credentials and employment of an expert witness to show bias or motive. *People v. Washington*, 80 Cal.Rptr.

567, 71 Cal.2d 1061, 458 P.2d 479 (1969). However, a prosecutor may not insinuate that an expert is unethical or incompetent without properly admitted evidence to support it. Unfair attacks on the veracity of a witness are of particular concern when the target is a key witness. *State v. Gonzales*, 105 Ariz. 434, 466 P.2d 388 (1970); *State v. Harrington*, supra; *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

The adversary system is the best system yet devised by man to determine the truth. For it to work properly, free-wheeling and wide-ranging cross examination is not only allowed, but protected and encouraged. *State v. Dunlap*, 125 Ariz. 104, 608 P.2d 41 (1980). The same is true for comment on the evidence by counsel. If these valuable tools for the determination of truth—cross examination and comment on the evidence—are to be retained, some restraint must be exercised by the court and its officers in order that witnesses who come into court, most of them willingly, to assist in determining the truth, are not insulted and abused. Counsel is given wide latitude in closing argument, *State v. Price*, 111 Ariz. 197, 526 P.2d 736 (1974), and juries are routinely instructed, as here, that comment of counsel is not evidence. We will, however, particularly in capital cases, scrutinize county attorneys' remarks carefully, *Burrows v. State*, 38 Ariz. 99, 297 P. 1029 (1931), and we will reverse if, based upon the circumstances of the individual case, the misconduct probably influenced the jury. *State v. Gonzales*, supra; *State v. Price*, supra.

There is no question that the defendant killed the victim. In addition to the self defense plea of the defendant, however, there was a question of whether this was first degree or second degree murder. If the wound was a contact wound, then it could be inferred that the victim was killed while asleep and with premeditation, which is the difference between first and second degree murder. If the shot was fired from a distance, then not only does defendant's self defense plea have some substance, but

there is less evidence of premeditation and a finding of second degree murder might follow. Under the circumstances, it cannot be said that the improper and unfounded attempt to discredit Dr. Hirsch did not influence the jury. From the record we have before us, we believe that the remarks of the county attorney were unsupported and when considered with the other examples of misconduct, constituted reversible error. A new trial should be granted.

Reversed and remanded for new trial.

HOLOHAN, C. J., GORDON, V. C. J., and HAYS and FELDMAN, JJ., concur.