NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

MARIA LOPEZ, *Appellant*.

Nos.  1 CA-CR 22-0036
1 CA-CR 22-0146
(Consolidated)
FILED 5-9-2023

Appeal from the Superior Court in La Paz County
No.  S1500CR201600044
The Honorable Matthew G. Newman, Judge, *Retired*

**AFFIRMED IN PART; VACATED IN PART AND REMANDED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eliza C. Ybarra
*Counsel for Appellee*

Carr Law Office, PLLC, Kingman
By Sandra Carr
*Counsel for Appellant*

**MEMORANDUM DECISION**

Presiding Judge Cynthia J. Bailey delivered the decision of the Court, in which Judge Jennifer B. Campbell and Judge David D. Weinzweig joined.

**B A I L E Y**, Judge:

**¶1**　　　Maria Lopez appeals her convictions and sentences for child abuse.[1]  For the following reasons, we affirm the conviction for child abuse committed recklessly, vacate the sentence for that conviction and remand for resentencing, and vacate the conviction and sentence for child abuse committed with criminal negligence.

**FACTS AND PROCEDURAL HISTORY**

**¶2**　　　Aiden was born in October 2015.[2]  He suffered a broken clavicle and ruptured blood vessels in his eyes during delivery, but he otherwise appeared healthy, and the delivery injuries resolved in due time. In his first four months, Aiden showed no developmental concerns, underlying medical conditions, or diseases, and no evidence of trauma.

**¶3**　　　When Aiden was three months old, his mother, Carmen, arranged for Lopez to babysit him two days a week.  Lopez lived next door to Carmen's mother.  Lopez had only a sixth-grade education but years of experience taking care of children.

**¶4**　　　A few days after Aiden turned four months old, Carmen dropped him off at Lopez's house at about 7:00 a.m.  He appeared fine that morning and was sleeping when Carmen left him.  At about 10:00 a.m., two women from a local church visited Lopez for ten to twenty minutes.  Aiden was awake, alert, and seemed "normal" and "healthy" during the visit.  He smiled, kicked his feet, looked around, and appeared "happy" when Lopez fed him some banana.

**¶5**　　　When Carmen arrived to pick up Aiden a little after 3:00 p.m., Lopez met her at the door and told her he "wasn't doing good."  Lopez told

---

[1]　　　Lopez also filed a notice appealing a restitution order, but she raises no claims about that order.

[2]　　　We use pseudonyms to protect the privacy of the victim and his mother.

Carmen she had tried to call her, but Carmen had no record of any missed calls from Lopez. Carmen went into the house and found Aiden already in his car seat—which was unusual. He was "pale," a "pink fluid" was leaking from his nose, and he was having "trouble breathing." Carmen rushed outside crying and screaming for her parents' help. The family brought him to a local hospital, and technicians took some scans before having him airlifted to Phoenix Children's Hospital that same day. Carmen called Lopez from the hospital to ask what happened, and Lopez told her Aiden "was sleeping most of the day and he wasn't eating."

¶6 Aiden arrived at Phoenix Children's Hospital with bilateral subdural hematomas—bleeding on both sides of the brain, in the space between the brain and the protective membrane lining the skull—and significant brain swelling as a result. When doctors operated to relieve the swelling, Aiden's heart stopped. They revived him and later placed a drain in his skull to reduce the swelling.

¶7 A pediatric neuroradiologist and a pediatric ophthalmologist each saw Aiden about a week after he entered the hospital. The neuroradiologist observed that Aiden had "extensive" brain swelling and hemorrhaging that extended down into his spinal column. The neuroradiologist also saw evidence of injury to Aiden's neck ligaments. The ophthalmologist found "thousands of hemorrhages throughout the back of both eyes," with blood sitting "in front of the retina, on the retina, and underneath his retina." Aiden was blind.

¶8 Police questioned Lopez. She told them that when Aiden woke up at about 9:00 a.m., he "was having difficulty breathing" and his "body went limp." She said she tried to reach Carmen by calling her personal and work phone numbers, but there was no record she had made such calls. Lopez also said she looked next door to see if Carmen's mother's car was there but did not see it. Carmen's mother later said she was home from work that day and did not leave the house for more than five minutes. When police asked Lopez why she did not bring Aiden to the hospital, she said nothing.

¶9 The State tried Lopez on one count of child abuse committed intentionally or knowingly. *See* Ariz. Rev. Stat. ("A.R.S.") § 13-3623(A)(1). The neuroradiologist and ophthalmologist who examined Aiden testified that his injuries likely arose from a single, significant trauma that caused his head to quickly accelerate and decelerate—as by being aggressively shaken or propelled into a stationary surface. A pediatrician who evaluated Aiden as part of the Child Protection Team at Phoenix Children's Hospital

testified that because he had no reported history of trauma, the combination of neck ligament injury, retinal hemorrhaging, and subdural hematomas were "suspicious for abusive head trauma" that could have been caused by an intentional whiplash motion. The pediatrician acknowledged that Aiden had no fractures and no external injuries or marks. But she said a child could receive internal injuries from an acceleration/deceleration event with no external injuries or bruising. At the time of trial, Aiden was six years old and unable to walk, see, or eat by mouth. He was permanently disabled and would require care for the rest of his life.

¶10 Lopez testified and denied abusing Aiden. She admitted she lied about calling Carmen and that she could have sought help for Aiden, but she insisted she did not realize how ill he was. She said he seemed "a little bit congested" when he woke at about 9:00 that morning and was "a little pale" and breathing "a little bit fast" after waking from another nap at noon but that she gave him some Tylenol and he seemed to improve after she fed and changed him.

¶11 A neurologist testified as an expert for the defense that Aiden's injuries were likely caused by a chronic subdural hematoma that arose at an earlier date and began to rebleed. In support of that hypothesis, the expert pointed to the presence of "intermediate" and "older" blood seen in Aiden's initial brain scans; he testified that subdural hematomas could easily rebleed and "enlarge suddenly and catastrophically" with little or no force; he disputed the neuroradiologist's conclusion that Aiden suffered injury to his neck ligaments; and he opined that abnormalities seen in Aiden's neck region, as well as the retinal hemorrhages, resulted from pressure caused by the rebleed and subsequent medical interventions. The expert also disputed that shaking alone, or impact with a soft surface, could cause bilateral subdural bleeding, and he contended that the amount of force needed to cause such bleeding would have caused other injuries and external marks that were not present.

¶12 State medical witnesses acknowledged that Aiden's scans showed blood at different "stages of healing or stages of bleeding" that could "be indicative of repeated trauma," but they also testified that it was hard to determine the precise age of subdural blood. Apart from Aiden's minor injuries at birth, the defense offered no evidence to explain how or when Aiden might have suffered earlier subdural hematomas. Aiden's pediatrician testified that he had never seen a baby develop a subdural hematoma from a normal delivery, it would take "a significant force" to cause such bleeding, and a baby with a subdural hematoma would present as irritable and not eating well.

**¶13**        The jury found Lopez not guilty of child abuse committed intentionally or knowingly but guilty of child abuse committed recklessly and with criminal negligence.   The superior court sentenced her to concurrent prison terms of five and three years.  We have jurisdiction over Lopez's timely appeal under Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

## DISCUSSION

I.        Sufficiency of the Evidence

**¶14**        Lopez contends the evidence was insufficient to support her convictions.  We review a claim of insufficient evidence de novo, viewing all facts and resolving all evidentiary conflicts in favor of the jury's verdict. *State v. Pena*, 235 Ariz. 277, 279, ¶ 5 (2014).   Our review is confined to determining whether substantial evidence supports the verdict.   *Id.* "Substantial evidence is more than a mere scintilla and is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *State v. Ellison*, 213 Ariz. 116, 134, ¶ 65 (2006) (citation omitted).  We do not reweigh the evidence to determine whether we would reach the same conclusions as the trier of fact.  *State v. Barger*, 167 Ariz. 563, 568 (App. 1990).

**¶15**        Lopez was convicted of violating A.R.S. § 13-3623(A).  One commits child abuse under § 13-3623(A) if "[u]nder circumstances likely to produce death or serious physical injury, [the] person [] causes a child . . . to suffer physical injury or, having the care or custody of a child . . . causes or permits the person or health of the child . . . to be injured or [] causes or permits a child . . . to be placed in a situation where the person or health of the child . . . is endangered."

**¶16**        Thus, § 13-3623(A) contemplates three ways to commit child abuse: (1) causing a child to suffer physical injury, (2) causing or permitting a child's person or health to be injured while in the defendant's care or custody, or (3) causing or permitting a child's person or health to be endangered while in the defendant's care or custody.  *State v. West*, 238 Ariz. 482, 490, ¶ 21 (App. 2015).  The penalties for child abuse vary, depending on whether the defendant acted intentionally or knowingly, recklessly, or with criminal negligence.  *See* A.R.S. § 13-3623(A)(1)–(3); *State v. Payne*, 233 Ariz. 484, 506, ¶ 71 (2013).

**¶17**        Lopez was found guilty of child abuse committed both recklessly and with criminal negligence.  A defendant commits child abuse "recklessly" by being "aware of and consciously disregard[ing] a

substantial and unjustifiable risk" that the defendant's conduct will cause or permit the child to be injured or endangered. A.R.S. § 13-105(10)(c). The risk must be such that disregarding it "constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." *Id.* A jury finding of recklessness necessarily establishes a finding of criminal negligence. *See* A.R.S. § 13-202(C) ("If a statute provides that criminal negligence suffices to establish an element of an offense, that element also is established if a person acts intentionally, knowingly or recklessly.").

¶18            Substantial evidence supports the verdicts. Reasonable persons could accept a jury determination that Lopez caused Aiden "to suffer physical injury" under A.R.S. § 13-3623(A) based on evidence that (1) he was in her care when the injuries manifested; (2) multiple doctors testified that his injuries were likely caused by someone recently inflicting an acceleration/deceleration of his head, as through a violent shaking; (3) shaking injuries would not necessarily leave external marks; (4) there was no indication he was injured by accident; (5) there were no reports of him suffering from a previous trauma, underlying disease, or disorder; and (6) Lopez made false and inconsistent statements that undermined the accuracy of her account. *See West*, 238 Ariz. at 487, ¶ 9 (finding substantial evidence the defendant caused the victim's injury where the defendant was the only adult present when the injury occurred, the defendant's accident defense was refuted by "virtually every doctor involved in [the victim's] emergency care," and there were inconsistencies in the defendant's account); *Payne*, 233 Ariz. at 507, ¶ 77 (finding substantial evidence the defendant caused the victim's injuries based on testimony that the injuries likely occurred while in the defendant's care); *see also State v. Fulminante*, 193 Ariz. 485, 494, ¶ 27 (1999) (observing that the defendant's false and inconsistent statements showed consciousness of guilt).

¶19            Lopez contends that the conclusions of the State's medical witnesses should be disregarded because those witnesses did not consider evidence that Aiden's condition was caused by a rebleed of a preexisting subdural hematoma. She points to the evidence of older blood seen in Aiden's initial brain scans, his lack of external injuries, and her expert's testimony that the injuries described by the ophthalmologist and neuroradiologist could have been caused by a rebleed and medical interventions.

¶20            Lopez's contentions do not establish a lack of substantial evidence. All she shows are conflicts in the evidence—which we resolve in favor of the verdict. The existence of a preexisting subdural hematoma was

not a settled fact given evidence that it is hard to determine the age of subdural blood and given the lack of evidence Aiden suffered an earlier trauma. Furthermore, Lopez's expert acknowledged his "rebleed" theory was not universally accepted and that he had been censured for giving biased testimony about rebleeds in six prior child abuse cases. In the end, no direct evidence explained precisely how Aiden was injured, and jurors could reasonably accept the State's theory.

¶21            Even were we to assume the evidence supported Lopez's rebleed theory and was therefore insufficient to show she physically caused Aiden's injury, substantial evidence still supports her convictions. Substantial evidence supports that Lopez "permit[ted] [Aiden's] person or health . . . to be injured" and "permit[ted] [him] to be placed in a situation where [his] person or health . . . [was] endangered," A.R.S. § 13-3623(A), by failing to seek care for him. In the five-hour period between when the women from the church left Lopez's house and Carmen arrived to pick up Aiden, he went from appearing to be a normal, healthy baby to suffering from a catastrophic brain injury that left him pale, limp, and struggling to breathe. According to Carmen's mother, he looked "like he had already passed" when the family brought him to the hospital that afternoon. Lopez's statements on the day of the incident and her testimony at trial show she was aware of his deterioration and considered seeking help for him. Her own expert testified that Aiden's condition declined gradually, as the bleeding caused swelling, which caused oxygen deprivation. Jurors could reasonably conclude that Lopez was aware Aiden needed medical assistance and that his prognosis would have been better had she sought help sooner. *See Payne*, 233 Ariz. at 507, ¶ 77 (finding substantial evidence the defendant permitted the victim to be injured where he made statements conveying that he knew the victim needed medical care but did not seek it).

¶22            Substantial evidence also supports the jury's findings that Lopez acted recklessly, A.R.S. § 13-105(10)(c), and "[u]nder circumstances likely to produce death or serious physical injury," A.R.S. § 13-3623(A). Jurors could consider Lopez's knowledge that Aiden was unwell, together with the catastrophic brain damage apparent after he left her care, in determining that she "consciously disregard[ed] a substantial and unjustifiable risk," A.R.S. § 13-105(10)(c), that her actions or omissions would harm him "[u]nder circumstances likely to produce death or serious physical injury," A.R.S. § 13-3623(A). *See State v. Allen*, 253 Ariz. 306, 312, ¶ 78 (2022) (reasoning that jurors may consider the defendant's knowledge that the victim was in a dangerous situation and the severity of the victim's resulting injuries in determining the defendant's guilt of child abuse); *State v. Martinson*, 241 Ariz. 93, 102, ¶ 41 (App. 2016) (reasoning that jurors may

consider severity of the victim's injuries "to conclude the abuse occurred under circumstances likely to produce death or serious physical injury").

II.    Juror Unanimity

**¶23**        Criminal convictions require unanimous verdicts.  Ariz. Const. art. 2, § 23; *Payne*, 233 Ariz. at 508, ¶ 81.  Lopez argues she was deprived of a unanimous verdict because A.R.S. § 13-3623(A) provides multiple ways to commit child abuse and the court refused to instruct jurors they could only find her guilty if they agreed on how she abused Aiden. We review the denial of a requested jury instruction for an abuse of discretion, but we consider de novo questions of statutory interpretation and whether the court's instructions correctly reflect the law.  *State v. Cox*, 217 Ariz. 353, 356, ¶ 15 (2007); *Allen*, 253 Ariz. at 312, ¶ 79.

**¶24**        The indictment against Lopez mirrored the language of § 13-3623(A).  The State alleged that "under circumstances likely to produce death or serious physical injury, [Lopez] intentionally or knowingly caused [Aiden], a child under fifteen years of age, to suffer physical injury, or having the care or custody of the child caused or permitted the person or health of the child to be injured or caused or permitted the child to be placed in a situation where the person or health of the child was endangered."

**¶25**        "If an indictment is facially valid, but the [S]tate introduces evidence of several acts, each of which might satisfy the charge, the risk of a non-unanimous verdict is presented."  *Payne*, 233 Ariz. at 508, ¶ 81 (citation omitted).  "However, jurors may find a defendant guilty based upon a combination of alternative findings if only one charge is alleged." *Allen*, 253 Ariz. at 313, ¶ 81 (citations omitted).

**¶26**        It is well-settled that § 13-3623(A) is an alternative-means statute—which means it provides more than one way to commit the single unified offense of child abuse.  *Id.* at ¶ 82; *accord West*, 238 Ariz. at 489–90, ¶¶ 19–22.  When a defendant is charged with violating an alternative-means statute, "[j]uror unanimity as to the theory under which [the] defendant committed [the] crime is not required."  *Allen*, 253 Ariz. at 313, ¶ 83 (citation omitted).  The superior court may instruct jurors on any of the alternative means charged and reasonably supported by the evidence.  *See West*, 238 Ariz. at 488, ¶ 15 ("If a statute describes a single offense which may be committed in more than one way, it is unnecessary for there to be unanimity as to the means by which the crime is committed provided there is substantial evidence to support each of the means charged." (quoting *State v. Forrester*, 134 Ariz. 444, 447 (App. 1982))); *see also State v. Cotten*, 228

Ariz. 105, 108, ¶ 5 (App. 2011) (holding the "trial court correctly instructed the jurors that they could return a guilty verdict if defendant violated [either one of two means in an alternative-means statute]" because there was evidence to support each of those means). It matters not, therefore, whether some jurors found Lopez committed child abuse by physically harming Aiden while others found her guilty by failing to seek help, provided there was substantial evidence to support her guilt under each of the three means set forth in § 13-3623(A).

¶27 As our analysis in the preceding section establishes, substantial evidence supports Lopez's guilt under each of the three means set forth in § 13-3623(A): causing Aiden to suffer physical injury, causing or permitting him to be injured while in her care, and causing or permitting him to be endangered while in her care. The superior court did not err by instructing jurors they could find Lopez guilty based on any of those means.

¶28 Lopez's efforts to distinguish her case from prior decisions rejecting a unanimity requirement in child abuse cases is unavailing. In *West*, this court rejected the defendant's argument that the superior court had to instruct jurors they must unanimously agree on a means of child abuse. 238 Ariz. at 492–96, ¶¶ 31–46. Lopez's case is indistinguishable from *West* in all relevant respects. In *West*, the sixteen-month-old victim died from "blunt impacts to the head with subdural hemorrhage" that occurred while in the defendant's care. *Id.* at 486, ¶¶ 2–3. As in this case, the State charged the defendant in *West* with intentional or knowing child abuse by the alternative means set forth in § 13-3623(A). *Id.* at ¶ 4. The State "had to allege the multiple acts" in *West*—as in Lopez's case—"because it did not know the precise timing and nature of the injury leading to [the victim's demise]." *Id.* at 496, ¶ 45. The defendant in *West*, like Lopez, "maintained she did not injure [the victim] and offered other possibilities as to what ultimately caused [the victim's condition]." *Id.* at 495, ¶ 42. In other words, the defense in both *West* and this case was an "overarching claim" that the defendant "did not injure" the victim. *Id.* at ¶ 43. Just as this court found in *West*, Lopez has "failed to demonstrate a reasonable basis for distinguishing among the multiple acts" alleged. *Id.* at 496, ¶ 45. No unanimity instruction was required under the circumstances.

### III. Alleged Prosecutorial Misconduct

¶29 Lopez argues that the prosecutor's improper trial conduct, and the superior court's failure to curb it, deprived her of a fair trial. She contends the prosecutor's behavior amounted to intentional misconduct. *See State v. Murray*, 250 Ariz. 543, 548, ¶ 12 (2021).

¶30        Whether based on allegations of inadvertent error or intentional misconduct, our analysis of a prosecutorial misconduct claim is the same. *Id.* The defendant must establish "that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at ¶ 13 (citations omitted). A defendant does so by showing that "(1) misconduct exists and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial." *Id.* (citations and internal quotation marks omitted).

¶31        When a defendant objects to allegations of prosecutorial misconduct, we review for harmless error, and when they do not object, we review allegations for fundamental error. *State v. Arias*, 248 Ariz. 546, 555, ¶ 31 (App. 2020). We assess each allegation independently and consider whether multiple acts of misconduct cumulatively led to an unfair trial. *Id.* at 556, ¶ 32; *State v. Johnson*, 247 Ariz. 166, 200, ¶ 133 (2019). We "evaluate [a defendant's] claims of prosecutorial misconduct in the context of the issues presented to the jury at trial." *Arias*, 248 Ariz. at 556, ¶ 33.

### A. Cross-examination

¶32        Lopez asserts that the prosecutor intentionally badgered and intimidated her during cross-examination. On direct examination, Lopez admitted she lied about phoning Carmen. The prosecutor revisited that testimony on cross-examination—repeatedly asking Lopez if she called Carmen and if she lied to police about doing so. Lopez contends the prosecutor repeated the same questions in an intimidating manner, confused her by quickly changing the subject, and then badgered her when she could not follow his line of thought. The superior court overruled defense counsel's objections that the prosecutor was badgering Lopez and repeating questions she had already answered.

¶33        The State has "great latitude" to impeach a defendant on cross-examination and "to show any matter which bears on the [defendant's] credibility." *State v. Torres*, 97 Ariz. 364, 366 (1965). Lopez's credibility was a key factor in the case, and the State had a right to question her about the false statements she made to Carmen and later to law enforcement. The line of questioning she challenges reveals no improprieties. It simply shows the prosecutor following up on questions about Lopez's statements after she answers the prosecutor's questions inconsistently with her prior testimony. Although the record is unclear whether Lopez's inconsistent testimony resulted from a misunderstanding of the questions, difficulties with the court interpreter, or an intent to

mislead, the record does not support her argument that the prosecutor intentionally set out to confuse her and then capitalize on that confusion.

¶34        Lopez also contends the prosecutor badgered her expert witness by repeating questions he had already answered, yelling at him, and harassing him about irrelevant issues.  Lopez objected more than a dozen times during the expert's cross-examination.  The superior court sustained many of her objections to questions being "asked and answered."  But the court overruled, or did not formally rule on, objections based on relevance, badgering, and yelling.

¶35        The testimony of Lopez's expert was critical to her defense.  Because the believability of her rebleed theory was largely tied to the expert's credibility, we consider the allegations of misconduct during his cross-examination in that context.  *See Arias*, 248 Ariz. at 556, ¶ 33.  As with lay witnesses, "[w]ide latitude is allowed in cross-examination of expert witnesses . . . for purposes of testing their knowledge, judgment, bias and the validity of their opinions."  *City of Tucson v. LaForge*, 8 Ariz. App. 413, 417 (1968).

¶36        The State has met its burden of showing that any improper questions to which Lopez objected were harmless.  The superior court sustained many of Lopez's objections to the prosecutor's repetitive questions, and the jury was instructed to disregard questions to which an objection was sustained.  We presume the jury followed that instruction here.  *See Payne*, 233 Ariz. at 513, ¶ 120.  As to Lopez's objections about badgering and yelling, the record does not show an intent to harass the defense expert.  It shows, rather, that the prosecutor at times raised his voice, or repeated a question, when the defense expert gave what might be considered an evasive or nonresponsive answer.

¶37        Lopez fails to show that the misconduct allegations to which she did not object amounted to fundamental, prejudicial error.  She contends that the prosecutor spent too much time criticizing irrelevant details in the expert's written report—including mistaken references to Aiden being a girl and being dropped off at a daycare center rather than Lopez's home, and the lack of footnotes, page numbers, or inclusion of Aiden's doctors' names in the report.  However, the prosecutor's questions were relevant to the expert's credibility and theory by suggesting the expert did not fully consider and address the facts of Aiden's case.  Given the latitude afforded on cross-examination and the importance of the defense expert's testimony in this case, the prosecutor's conduct was not improper.

B. Closing Argument

¶38        Lopez also argues the prosecutor committed misconduct during closing argument by denigrating the defense expert and by expressing the prosecutor's personal beliefs.  Because Lopez did not object at trial, we review the challenged statements for fundamental error only.

¶39        Lopez first contends the prosecutor engaged in a "wholesale denigration" of the defense expert's testimony based on the expert's decade-old censure.  In the State's initial and rebuttal closing arguments, the prosecutor repeatedly referred to the defense expert being "censured," "disciplined," "punished," and "biased."

¶40        "Because attorneys are given wide latitude in closing arguments and may draw reasonable inferences from the evidence," *Arias*, 248 Ariz. at 563, ¶ 67 (citation omitted), the prosecutor's characterization of the defense expert here was permissible.  The credibility of the expert's rebleed theory was paramount to the jury's assessment of Lopez's guilt, and evidence that the expert had been censured for giving similar testimony in similar cases was therefore highly relevant.  Under the circumstances, the prosecutor did not engage in misconduct by emphasizing the expert's prior censure as a reason to discredit his opinion.  *Cf. id.* at ¶ 69 (concluding that characterization of an expert's testimony as "contaminated" and "foul" was improper because it was not reasonably supported by the evidence).

¶41        Lopez also argues that the prosecutor impermissibly vouched for the State's case by conveying his personal beliefs during closing arguments.  First, she challenges two statements he made using the phrase "I submit to you":

> Then I asked [the defense expert], and I was surprised he answered it this way, if the child had a pre-existing condition and the child was shaken, could you get those bilateral subdural hematomas?  And he said yes.  He said yes, I sat down.  Then he started talking on his own.  And I submit to you that he knew that what he just said was accurate.

> . . . .

> I submit to you, ladies and gentlemen, that [the defense expert] has no credibility.  He testified that a child with a chronic subdural hematoma can poop and end up the way [Aiden] ends up?  That's insulting.  That's not a defense.  That's an insult.  And I am not here to insult your intelligence.

I'm here to appeal to it. [The defense expert] has no credibility.

¶42 Second, Lopez challenges the prosecutor's frequent use of the phrases "how do we know that" and "we know." She offers five examples:

[A State expert] said that in a child of [Aiden's] age, four months, there was no history of trauma. Well, how do we know that? Because [Aiden's pediatrician] testified to the same thing.

. . . .

We know from [a State expert] in his testimony that nothing was wrong with that baby. Because if [] that baby [had] been abused, and the juror asked the question, we would have seen the results immediately. The child was healthy.

. . . What happened in that short time frame from when those ladies left when the baby was absolutely healthy until the mom picked the child up and ran out of the house screaming? We know what happened. The evidence shows us that the defendant abused the child. . . .

. . . .

Well, how do we know that [the defense's rebleed theory] didn't happen? [The defense expert witness], biased testimony. He was disciplined, punished . . . for six cases where he gave biased testimony in rebleeds. Just like he talked about here.

. . . .

. . . And we know that [the defense expert has] already been biased [sic] and disciplined for it, based on his own theory, that he's never done any independent research [on], never.

¶43 A prosecutor may not vouch for the State's case by "plac[ing] the prestige of the government behind its evidence" or "suggest[ing] that information not presented to the jury supports the evidence." *State v. Martinez*, 230 Ariz. 208, 215, ¶ 29 (2012) (citations omitted). To that end, "[a]

prosecutor must not convey his personal belief about the credibility of a witness," *State v. Lamar*, 205 Ariz. 431, 441, ¶ 54 (2003) (citation omitted), or "a defendant's guilt or innocence," *State v. King*, 110 Ariz. 36, 42 (1973). But prosecutors are otherwise "given wide latitude in argument." *State v. Bailey*, 132 Ariz. 472, 478 (1982). They may make comments "based on the evidence or reasonable inferences which may be drawn from it," *id.*, and may also criticize defense theories and tactics, *State v. Ramos*, 235 Ariz. 230, 238, ¶ 25 (App. 2014).

¶44 We see no improper vouching in the prosecutor's "I submit to you" statements. In each case, the prosecutor was not expressing a personal belief but submitting that jurors accept a reasonable inference from the evidence. *See State v. Maddasion*, 24 Ariz. App. 492, 494, 496 (1975) ("Viewed in context, [the prosecutor's] remarks [preceded by "I submit to you"] appear merely to argue justifiable inferences from the evidence."); *Ramos*, 235 Ariz. at 238, ¶ 27 ("[T]he prosecutor's use of the phrase 'the State submits' [was not improper because it] was limited to discussing the evidence presented at trial and did not suggest he was aware of information not presented to the jury that would support a finding of guilt.").

¶45 "[B]ecause there is a fine contextual line between the use of 'we know' inclusively, i.e., to describe evidence and outline inferences from that evidence with the jury, and the use of 'we know' in an exclusive manner, i.e., to refer to the State collectively," our supreme court has "caution[ed] prosecutors to refrain from using 'we know' and similar phrases to suggest that their argument bears the imprimatur of the [S]tate." *State v. Acuna Valenzuela*, 245 Ariz. 197, 218, ¶ 85 (2018). Whether a prosecutor's use of such phrases crosses the line must be considered in context. *See id.* at ¶¶ 84–85. Lopez fails to show improper vouching here because each challenged remark was used to summarize or characterize specific trial evidence. Using "we know" as a rhetorical device to marshal reasonable inferences from the evidence is permissible. *See id.* at ¶ 84 (citing *United States v. Ruiz*, 710 F.3d 1077, 1086 (9th Cir. 2013)).

¶46 Even if the prosecutor's statements constituted impermissible vouching, Lopez has not established a "reasonable likelihood" that the statements "could have affected the jury's verdict, thereby denying [her] a fair trial." *Murray*, 250 Ariz. at 548, ¶ 13 (citations omitted). The superior court instructed jurors that the lawyers' comments were not evidence and it was the jury's province to determine the facts of the case, including what testimony to accept and reject. "These instructions were sufficient to dispel any taint if vouching occurred." *Payne*, 233 Ariz. at 512, ¶ 113 (citation omitted).

### C. Cumulative Effect

**¶47** Lopez argues that the prosecutor's misconduct was "nearly continuous" during the defense's case-in-chief and that it was intentionally calculated to obtain a conviction by shifting jurors' attention from the defense's medical evidence. She contends that the cumulative effect of the misconduct deprived her of due process.

**¶48** To prevail on a claim of cumulative misconduct, the defendant must show misconduct that is "so pronounced and persistent that it permeated the entire atmosphere of the trial, indicating that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant." *Payne*, 233 Ariz. at 515, ¶ 134 (citations and internal quotation marks omitted). Because the record does not establish that the State engaged in pervasive misconduct that deprived Lopez of a fair trial, we reject her claim of cumulative misconduct.

### D. The Superior Court's Control of Courtroom Decorum

**¶49** Finally, Lopez argues that the superior court deprived her of a fair trial by failing to control the prosecutor's behavior during cross-examination. Because she did not timely object on that basis, we review for fundamental error only. *State v. Escalante*, 245 Ariz. 135, 138, ¶ 1 (2018).

**¶50** The superior court has "discretion to determine and control the method of interrogation," *Pool v. Superior Court*, 139 Ariz. 98, 104 (1984), and it should reasonably exercise that discretion "so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment," Ariz. R. Evid. 611(a). The record shows no abuse of discretion here. As we observed above, the prosecutor's examination of Lopez and her defense expert was generally reasonable under the circumstances. To the extent that the prosecutor may have crossed the line, the record shows that the superior court adequately maintained control. The court sustained many of Lopez's "asked and answered" objections, and even if the court did not technically sustain her objections that the prosecutor was badgering or yelling at a witness, the court cautioned the prosecutor about his conduct several times—instructing him to "start over" after one objection, to "tone it down just a hair" after a second, and saying, "I'm sure he'll tone it down in a second," after a third.

### IV. Sentencing Errors

¶51        Lopez argues the superior court erred by (1) sentencing her on two child abuse convictions (one committed recklessly and the other committed with criminal negligence) and (2) aggravating those sentences. Lopez timely objected at the time of sentencing, and the State concedes error on appeal. Although we need not accept a concession, *see State v. Sanchez*, 174 Ariz. 44, 45 (App. 1993), we agree that the court erred.

## A.  Double Jeopardy

¶52        Lopez was charged with a single count of child abuse, but the jury found her guilty of child abuse committed recklessly and with criminal negligence in two separate verdicts. She submits that the superior court violated double jeopardy principles by refusing to vacate the conviction for child abuse committed with criminal negligence. We review a double jeopardy claim de novo. *State v. Carter*, 249 Ariz. 312, 315, ¶ 7 (2020).

¶53        The double jeopardy clauses of our state and federal constitutions protect a defendant from being punished twice for the same offense. *Id.* A greater and its lesser-included offense are considered the same offense for double jeopardy purposes, *see id.* at 316, ¶ 13, and the protection against double jeopardy applies even if a defendant receives concurrent sentences for those offenses, *id.* at 314, ¶ 1 n.1. As we observed above, the jury finding that Lopez committed child abuse recklessly necessarily included a finding that she committed child abuse with criminal negligence. *See* A.R.S. § 13-202(C). Lopez's conviction of child abuse committed with criminal negligence was therefore a lesser-included offense of child abuse committed recklessly. *See Carter*, 249 Ariz. at 316, ¶ 10. The protection against double jeopardy requires that the conviction and sentence for child abuse committed with criminal negligence be vacated. *See id.* at 320, ¶ 27; *State v. Nunn*, 250 Ariz. 366, 370, ¶¶ 16–17 (App. 2020).

## B.  Aggravation

¶54        The State did not allege, and the jury did not find, any statutory aggravating circumstances. And yet the superior court aggravated Lopez's sentence based on harm to the victim. *See* A.R.S. § 13–701(D)(9). When Lopez objected that no aggravating factors had been presented to the jury, the court said it was treating harm to the victim as "a non-statutory aggravating factor" and also agreed with the prosecutor's position that such harm was implicit in the offense.

¶55        Whether the superior court may use a particular factor to aggravate the defendant's sentence presents a question of law that we

review de novo. *See State v. Dunbar*, 249 Ariz. 37, 51, ¶ 41 (App. 2020). We agree with the parties that the court erred by aggravating Lopez's sentence.

**¶56**        A defendant has a right to pretrial notice of statutory allegations that could increase her sentence. *See* Ariz. R. Crim. P. 13.5(a), 16.1(b); *see also State v. Benak*, 199 Ariz. 333, 336–37, ¶ 14 (App. 2001) ("Pretrial notice enables a defendant to know the full range of potential punishment he faces upon conviction; fundamental fairness and due process require that allegations that would enhance a sentence be made before trial so that the defendant can evaluate his options." (citations omitted)). As the State correctly observes, the lack of notice here prejudiced Lopez. It deprived her of an opportunity to argue against an aggravated sentence in her presentence memorandum, and she appeared surprised when the court "spontaneous[ly]" decided to aggravate her sentence. *Cf. Benak*, 199 Ariz. at 337, ¶ 16 (observing that alternative notice in lieu of statutorily required notice may be sufficient if the notice is "such that the defendant is not 'misled, surprised or deceived in any way by the [sentence-enhancement] allegations'" (citation omitted)). Nor could the superior court aggravate Lopez's sentence under A.R.S. § 13-701(D)(27), the catch-all provision, which broadly encompasses factors "relevant to the defendant's character or background or to the nature or circumstances of the crime." *See State v. Schmidt*, 220 Ariz. 563, 564, ¶ 1 (2009) ("[A] court may not, consistent with due process, increase a defendant's maximum potential sentence based solely on a so-called 'catch-all' aggravator . . . ."). Because no aggravating factors were properly alleged and proved, Lopez must be resentenced on her conviction for child abuse committed recklessly to no greater than the statutory presumptive term. *See id.* at 565–66, ¶¶ 7, 12.

## CONCLUSION

**¶57**        We affirm Lopez's conviction for child abuse committed recklessly, vacate the sentence on that count and remand for resentencing in accordance with this decision, and vacate the conviction and sentence for child abuse committed with criminal negligence.

